STATE

v.

Ronald F. BARTON et al.

No. 79–429–C.A.

Supreme Court of Rhode Island.

April 7, 1981.

Dennis J. Roberts, II, Atty. Gen., Kathryn A. Panciera, Sp. Asst. Atty. Gen., for plaintiff.

Ralph A. Gonnella and Peter DiBiase, Providence, for defendant Ronald F. Barton.

OPINION

KELLEHER, Justice.

Following the publication of our January 15, 1981 opinion in which we rejected the appeals of the defendants, Ronald F. Barton (Barton) and James Murphy (Murphy), Barton filed a motion to reargue. His motion asks that we reconsider his attack on the sufficiency of the evidence adduced by the state to support a charge that Barton and others had conspired to break into and enter in the nighttime the manufacturing plant owned by Vennerbeck and Clase, Inc. (Vennerbeck). The plant is located in an industrial park situated in the westerly portion of the town of Lincoln. Our refusal to consider the sufficiency of the evidence was based upon Barton's failure to seek a judgment of acquittal in the trial court. In his motion to reargue, Barton points out that his challenge to the sufficiency of the evidence came by way of a motion for a new trial rather than by way of a motion for judgment of acquittal. An examination of his brief bears out this contention. Even though we must concede the failure to consider the new trial issue, there is no need for a reargument.

The challenge that Barton mounts to the evidence is somewhat unique. He concedes that the evidence would support a finding that there was a conspiracy to break into Vennerbeck's plant but contends that there is no evidence that the conspirators had intended to go into the plant during the nighttime. Before assessing Barton's "nighttime" defense, we shall briefly recapitulate the pertinent evidence.

As a result of a lengthy, ongoing, and sophisticated police surveillance, members of the Rhode Island State Police and Federal Bureau of Investigation (FBI) were quite conscious during the spring of 1977 that Barton and several other individuals, in-

cluding Murphy, were planning to relieve Vennerbeck of all or a portion of its inventory of precious metals, which had a value at that time in excess of $1 million. At nightfall on May 29, 1977, a stakeout team took a position within Vennerbeck's plant and remained there until about 3 a. m. on May 30. During that period, the phone rang on twenty or twenty-five separate occasions. The detail could hear noises and a loud thump. Seventeen hours later, the stakeout detail returned to the industrial-park area, and its members were deployed in several scattered, strategic locations.

At approximately 11:15 p. m. on May 30, FBI agents who were stationed on an embankment located across the street (Carol Drive) from the plant noticed four individuals pass before them. Three of the four walked to the middle of Carol Drive and removed a cover from a manhole. After a flashlight search of the manhole's interior, one of the group, who carried a walkie-talkie, reported to some distant associate, "Everything looks good. Nobody has discovered our work. It's great. We should have no trouble." The associate replied, "Okay, we've got a problem here. Go back." The agents moved in. Murphy was arrested, but his three companions took off into the nearby woods, leaving behind them a blue gym bag full of various articles.

Shortly before 12:55 a. m. on May 31 Barton was observed walking up the driveway of a house the address of which was 1 Rolling Woods Drive, a street that is a short distance from the industrial-park area. Parked in the driveway were a green Pontiac, an Oldsmobile Cutlass, and a beige van. (Earlier in the evening, at approximately 5:30 p. m., the State Police had observed these vehicles and the seven named conspirators assemble at a restaurant parking lot in Providence and then proceed northerly toward Lincoln.) As the police watched, Barton opened the door of the Pontiac, took out a black bag, and placed the bag in the garage that is attached to the Rolling Woods Drive residence. He then returned to the Pontiac and removed from it a crowbar, which he also placed in the garage. When Barton attempted to drive away, he was arrested, At the time of the arrest, he was carrying a walkie-talkie. Within a matter of hours, the police had arrested five of the seven named conspirators, with all of the arrests taking place within the industrial-park locality.

An inspection of the manhole's interior disclosed that the cable that supplied Vennerbeck's telephone service had been mutilated. The cable was described as a "fifty-pair" cable. A telephone company expert explained to the jury that in the parlance of the cable trade, a "line" or a "wire" is called a "pair," and each phone is "fed" by two wires or two pair. Someone had tampered with ten of the fifty wires. Two of the fifty wires that were enclosed in the cable served the plant's burglar-alarm system, and everyone conceded that the persistent ringing of the phones on the previous evening indicated that someone was attempting to bypass the alarm system. Among the equipment abandoned by the conspirators was a telephone repairperson's hand set. The set is an all-in-one product; it contains a dial, a mouth piece, an ear piece, and two wires, each of which is equipped with a clip.

In claiming that the evidence does not support any inference that the break was scheduled for the evening of May 30, Barton points to the testimony of a telephone-company representative who, after he had explained the bypass procedure to the jury, pointed out that the batteries found in the Rolling Woods Drive garage would not have provided the requisite voltage for a successful bypass of Vennerbeck's "multiplex system." According to Barton, if the break was going to have occurred during the evening hours of May 30, the conspirators would have had on hand the proper type of battery so that there would be no doubt about bypassing the alarm. Barton merits an *A* for ingenuity, which is offset by an *F* for his grasp of the law of conspiracy.

■ Barton somehow forgets that the essence of a conspiracy is an unlawful agreement. It is totally immaterial that the agreement be successfully or substantially

carried out because once the agreement is made, the offense is complete. *State v. LaPlume*, 118 R.I. 670, 375 A.2d 938 (1977); *State v. Giorgi*, 115 R.I. 1, 339 A.2d 268 (1975); *State v. Gilman*, 110 R.I. 207, 291 A.2d 425 (1972).

■ We shall assume that the trial justice, in his consideration of Barton's motion for a new trial, failed to evaluate properly the evidence adduced at trial. In such instances, we will review the record and grant a new trial only if the evidence strongly preponderates against the verdict. Since we have not seen or heard the witnesses, we apply the appellate rule and examine the record in the light most favorable to the prosecution to determine whether there is any competent evidence that would support proof of guilt beyond a reasonable doubt. *State v. Barnes*, R.I., 409 A.2d 988 (1979); *State v. Palmigiano*, 111 R.I. 739, 306 A.2d 830 (1973); *State v. Contreras*, 105 R.I. 523, 253 A.2d 612 (1969). The sole issue before us is whether there is any competent evidence that would support the jurors' finding that Barton was a participant in a plan to break into Vennerbeck's plant after dark.

■ Although a common agreement is a keystone of any criminal conspiracy, it is difficult to prove the explicit terms of such an agreement. Consequently, the conspirators' goals may be inferentially established by proof of the relations, conduct, circumstances, and actions of the parties. *State v. Murphy*, 113 R.I. 565, 323 A.2d 561 (1974).

■ Reason tells us that a person's actions afford the best evidence of his or her intent. A significant indication of the conspirators' nocturnal intent can be found in a bag that was discovered abandoned on Carol Drive. This bag contained three flashlights. Anyone knows that artificial illumination is not required during a daytime operation. Furthermore, the only attempt to approach Vennerbeck's facility directly, occurred after sundown—the tampering episode on May 29 and the reconnoitering chapter on May 30.

Barton, we are sure, would concede that he is a reasonable man and that any reasonable-minded individual who is about to embark upon a breaking-and-entering escapade aims to escape detection. Chances of escaping detection, particularly when embarking upon an operation of the magnitude contemplated at Vennerbeck's plant, are much better when the breaking and entering go on under the cover of darkness rather than during the light of day.

Another factor to be considered was the timing in calendar terms of the move toward the plant. Back in May 1977, while most Americans were celebrating the long Memorial Day weekend by enjoying any number of recreational activities, Barton and his associates were hard at work. The manhole detail's operations on the evening of May 29 and the advance party's enthusiastic and optimistic report on May 30 about how things looked "good," "great," and "trouble[-free]" are convincing proof that the conspirators intended that their heist would be a fait accompli when Vennerbeck's employees returned to work on May 31.

In his charge to the jury, the trial justice exhorted the jurors to use their common sense in evaluating the evidence, and in our opinion the jurors adhered to these sentiments when they returned a guilty verdict on the conspiracy count.

The motion to reargue is denied.

BEVILACQUA, C. J., and SHEA, J., did not participate.