**Supreme Court**

No. 2011-257-C.A.

(P1/09-622AG)

State                              :

v.                              :

Kayborn Brown.                              :

NOTICE:  This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

| State | : |
| :---: | :---: |
| v. | : |
| Kayborn Brown. | : |

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Flaherty, for the Court.** The defendant, Kayborn Brown, appeals from a judgment of conviction for incidents occurring on August 4 and August 6, 2008. As a result of those events, the defendant was charged with ten offenses in a single indictment: the murder of Jorge Restrepo in violation of G.L. 1956 § 11-23-1 (count 1), conspiracy to commit murder in violation of G.L. 1956 § 11-1-6 (count 2), first-degree robbery in violation of G.L. 1956 § 11-39-1 (count 3), conspiracy to commit robbery in violation of § 11-1-6 (count 4), carrying a pistol without a license in violation of G.L. 1956 § 11-47-8(a) (count 5), carrying a dangerous weapon while committing a crime of violence in violation of § 11-47-3 (count 6), using a firearm when committing a crime of violence in violation of § 11-47-3.2 (count 7), carrying a pistol without a license in violation of § 11-47-8(a) (count 8), reckless driving in violation of G.L. 1956 § 31-27-4 (count 9), and driving on a suspended license in violation of G.L. 1956 § 31-11-18 (count 10).[1]

---

[1] The indictment charging defendant included eleven offenses; however, count 11 charged defendant's brother, Keishon Brown.

On November 23, 2010, after five of the counts were dismissed under either Rule 48(a) of the Superior Court Rules of Criminal Procedure or by grant of defendant's motion to acquit under Rule 29 of the Superior Court Rules of Criminal Procedure, the jury returned guilty verdicts on the five remaining counts for first-degree murder (count 1), first-degree robbery (count 3), conspiracy to commit robbery (count 4), carrying a pistol without a license (count 5) and reckless driving (count 9). On April 14, 2011, the trial justice sentenced defendant to life for count 1, ten years for count 4, ten years for count 5, and one year for count 9, all sentences to be served consecutively.[2]

Brown advances a number of issues on appeal. However, after a careful review of defendant's arguments and a thorough review of the record, we affirm the judgments of conviction.

## I

## Facts and Travel

In the early evening of August 4, 2008, a brutal robbery and murder occurred in Central Falls. After completing his work shift at Vac-Forming in Central Falls, Jorge Restrepo began the short walk to his home on Watson Street. Tragically, before he reached his home, Restrepo was accosted, robbed, and viciously beaten to death by two assailants. In the densely populated neighborhood, several people witnessed the incident.

Diego Rodriguez testified that he was visiting a family member on Watson Street at about 5 p.m. on August 4. After parking his car, and as Rodriguez walked to his cousin's home, he observed two young black males, also on Watson Street. After entering his cousin's house and

---

[2] The trial justice declined to sentence defendant on the first-degree robbery charge because that charge had served as the basis for the felony murder. He did, however, allow the conviction to stand. See State v. Scholl, 661 A.2d 55, 57 n.1 (R.I. 1995).

exchanging pleasantries, Rodriguez said that he stepped back outside through the front door because he did not like the aroma of a meal that was being prepared. Rodriguez testified that, after stepping outside, he heard a man screaming for help. Rodriguez then observed a man on the ground; he saw one of the two youths, whom he had seen earlier, strike the man in the face and attempt to remove what was in his pockets. Rodriguez described one of the assailants as taller than the other and testified that the taller man had kicked Restrepo in the head "like if he was a football." After Rodriguez yelled at the two men to stop, one of them turned to look at him. Rodriguez then moved towards the fracas to help the victim and got a second look at the same assailant. Rodriguez said he observed the taller of the two more closely and said that that person had braids in his hair and was wearing a white T-shirt with black shorts. Rodriguez also testified that just before the pair fled the scene, he saw the taller one remove a red firearm from his waistband.

Manuel Coelho said that he arrived on Watson Street in his red pickup truck at about 5:30 p.m. He also observed two men kicking and hitting Restrepo. He then saw the two rip Restrepo's pants and steal his wallet. Coelho said that the events unfolded very quickly, but he was able to describe the two men as skinny, having dark skin, and between eighteen and twenty years of age. He also testified that both men were about 5'6" or 5'7" and could describe the clothing of only one of the two, saying that that assailant was wearing jeans and a red top. On cross-examination, Coelho testified that he did not recognize defendant as one of the men who attacked Restrepo.

At around the same time, James Major, Restrepo's supervisor at Vac-Forming Unlimited drove his normal after-work route along Watson Street. Major testified that he pulled up behind a red pickup truck that was stopped in the lane of travel. Major indicated that he observed two

black men emerge from the front of the pickup truck and that one of them was carrying a red gun in his right hand. Major testified that his attention was focused on the red gun, and, as a result, he could not positively identify either of the men. He was, however, able to describe both men as black, between nineteen and twenty years old, and also that the one carrying the firearm was wearing a red do-rag.[3]

Central Falls police officer Patrick Rogan was dispatched to Watson Street for a report of a man down. At approximately 5:37 p.m., Officer Rogan arrived on Watson Street where a group from the neighborhood was already starting to crowd the street. When he got out of his cruiser, Rogan saw Restrepo lying on his back on the street, apparently unconscious. He noticed that Restrepo's eyes were slightly open, that he was breathing slowly, and that he had urinated on himself. Within a minute of Rogan's arrival, emergency rescue personnel arrived, began to stabilize Restrepo, and placed him in the rescue vehicle. Rogan accompanied Restrepo to Memorial Hospital.[4] After initial treatment at that hospital, Restrepo was transferred to Rhode Island Hospital because of the serious nature of the trauma he had experienced. Unfortunately, however, and despite all efforts to save him, Restrepo was pronounced dead at Rhode Island Hospital at 11:05 p.m.

Lieutenant Steven Bradley, along with other responding police officers from Central Falls, transported Rodriguez, Coelho, and Major, along with a number of other potential witnesses to the police station in an effort to obtain more detailed information and formal statements from them. Based on the description of the assailants provided by Rodriguez and others, the police prepared a photo array consisting of about 500 photographs. However, none of

---

[3] A "do rag" or "doo rag" is a "simple piece of cloth tied at the back, used to cover the head, which was initially associated with African-American men." Russell K. Robinson, Uncovering Covering, 101 Nw. U. L. Rev. 1809, 1825 n.93 (2007) (internal quotations omitted).

[4] Restrepo's daughter was also in the rescue vehicle.

the witnesses, including Rodriguez, was able to identify either assailant from the photographs shown to them. On August 5, Rodriguez returned to the police station to review another photo array that had been prepared by the Pawtucket police department. Again, Rodriguez was not able to identify either assailant. A photograph of defendant was not included in either of the photo arrays that Rodriguez reviewed on August 4 or August 5, 2008.

On August 6, 2008, two days after the savage attack on Restrepo, two Providence police officers observed a white Acura containing two occupants traveling on North Main Street in Providence at approximately forty to forty-five miles per hour in a twenty-five-mile-per-hour zone. The officers activated the police cruiser's sirens and lights and followed the Acura. Approximately ten blocks later, the driver finally pulled over. But, after the officers exited their vehicle and began to approach the Acura, the driver suddenly drove away at a high rate of speed. A chase ensued through Providence at speeds approaching 100 miles per hour until the vehicle became disabled on the Branch Avenue overpass above Interstate 95. The two occupants then fled the car on foot. One of the officers observed the passenger of the vehicle holding a handgun in his right hand as he fled. Both suspects, one of whom was defendant and the other his brother, Keishon, soon were apprehended. Shortly thereafter, police located a red Cobra handgun in the bushes along the embankment. Police later identified defendant as the driver of the Acura.

Central Falls police became aware of the car chase in Providence, and that department secured a photo array, which included defendant, from Providence police to show to Rodriguez. Rodriguez returned to the Central Falls police station on August 8, 2008, and viewed an array of six photographs. This time, Rodriguez identified defendant, and he marked his initials next to defendant's picture.

The defendant was charged with ten offenses on February 27, 2009. Prior to trial, counts 2 (conspiracy to commit murder), 6 (carrying a dangerous weapon while committing a crime of violence), and 10 (driving on a suspended license) were dismissed pursuant to Rule 48(a). The defendant's jury trial commenced on November 18, 2010, in the Superior Court.

Significantly, three police officers testified during the trial about the unusual nature of the red firearm. Detective James Clift of the Providence Police Department's Bureau of Criminal Identification (BCI) testified that his duties at the BCI included processing firearms of which the police come into possession. He stated that in his sixteen-year career at the BCI, and, after examining hundreds of firearms, he had never seen a pistol similar in color to the one seized after the August 6 incident. Sergeant Christopher Reed of the Central Falls police department testified that, in his eleven-year career as an armorer, weapons instructor, and handler of hundreds of weapons, he also had never seen a handgun of this color. Finally, Lt. Steven Bradley, who had served in a variety of positions in his fifteen years with the Central Falls police department, testified that he never had encountered a firearm that had the same or similar color as the one seized after the car chase.

After the state's case concluded, defendant moved for judgment of acquittal on count 7 (using a firearm to commit a crime of violence) and count 8 (carrying a pistol without a license), motions that the trial justice granted. The defendant then called three witnesses to present an alibi for his whereabouts on August 4, 2008. The first, Bernice Brown, testified that defendant and his girlfriend stayed with her for a few weeks during the month of August, 2008. She stated that she unexpectedly had to take a trip to Virginia on August 3, which was also her son's birthday, and she left her four children in the care of defendant and his girlfriend. Brown said that she returned on August 5, and, on August 6, she loaned her white Acura to defendant and his

brother Keishon.  Bernice Brown's sixteen-year-old daughter, Aaliyah Robinson, testified that on August 4, Robinson, her siblings, defendant, and his girlfriend went to Scarborough Beach, arriving around noon and remaining until dusk.  Robinson testified that, upon returning from the beach, defendant remained at her home for the rest of the evening watching movies.  On cross-examination, Robinson admitted that she had not told the police or anyone outside her family about the beach excursion until asked about it by defense counsel.  Craig Robinson, Bernice Brown's son, whose tenth birthday was August 3, also testified about the trip to the beach on August 4.  On cross-examination, he testified that defendant and his girlfriend stayed at his house only for the two days while his mother was gone and that he had spoken multiple times with his mother, his sister, and defense counsel about his testimony prior to trial.

On November 23, the jury returned verdicts of guilty on the five remaining counts.  The defendant then filed a motion for a new trial, which the trial justice denied on December 20.  On April 14, 2011, the trial justice sentenced defendant.  The defendant filed a timely appeal to this Court.[5]

Additional facts will be supplied as necessary throughout this opinion.

## II

### Analysis

The defendant presses five arguments on appeal.  Brown argues first that the trial justice erred when he did not grant defendant's motion to sever the counts relating to the murder/robbery (counts 1 through 7) from the counts relating to the police chase (counts 8 through 10) under the provisions of Rule 8(a) of the Superior Court Rules of Criminal Procedure.

---

[5] The defendant filed his appeal on May 2, 2011, but judgment was not entered until May 11, 2011.  Pursuant to Article I, Rule 4(b) of the Supreme Court Rules of Appellate Procedure, a notice of appeal filed before entry of judgment is "treated as filed after such entry and on the day thereof."

Next, defendant argues that even if joinder had been proper under Rule 8(a), the trial justice nonetheless erred by not granting defendant's motion to sever the remaining August 4 offenses (counts 1, 3, 4, 5, and 7) from the August 8 offenses (counts 8 and 9) under Rule 14 of the Superior Court Rules of Criminal Procedure. Third, Brown claims that the trial justice impacted defendant's right to a fair trial when he refused to allow a police artist's sketch into evidence. Fourth, defendant maintains that the trial justice erred when he denied defendant's motion to exclude three autopsy photographs from evidence. Finally, defendant contends that the trial justice erred in denying his motion for a new trial under Rule 33 of the Superior Court Rules of Criminal Procedure. We will address each of these arguments in turn.

## A

## Rule 8(a) Joinder

On appeal, defendant argues that the charges stemming from the August 4 and August 6 incidents were improperly joined because they were based on two entirely different series of events that had no similarity of character, plan, or purpose. The indictment charged defendant with ten counts. Prior to trial on October 25, 2010, defendant filed a motion to sever the offenses that related to the murder occurring on August 4, 2008, from those linked to the police chase on August 6, 2008. [6] The trial justice denied the motion, ruling that there was a "clear nexus" between the alleged possession of the firearm on August 6 and the robbery/murder on August 4. The trial justice also noted that the unusual nature of the red firearm served as the link between the two incidents.

---

[6] By the time that the trial justice heard defendant's motion to sever, counts 2, 6, and 10 had been dismissed pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure.

**1**

**Standard of Review**

"[W]hen confronted with questions of law on appeal, this Court undertakes a de novo review." State v. Eddy, 68 A.3d 1089, 1098 (R.I. 2013) (quoting State v. Lopez-Navor, 951 A.2d 508, 510–11 (R.I. 2008)).  It is well settled that, "[b]ecause proper joinder under Rule 8(a) is a matter of law, we review de novo whether the state properly joined one or more charges in a single indictment * * * ." State v. Kluth, 46 A.3d 867, 873 (R.I. 2012) (quoting State v. Rice, 755 A.2d 137, 142 (R.I. 2000)); see also State v. Pereira, 973 A.2d 19, 25 (R.I. 2009); State v. Hernandez, 822 A.2d 915, 918 (R.I. 2003).  In deciding whether joinder is proper, Rule 8(a) is to be interpreted broadly to enhance judicial efficiency. See United States v. Berg, 714 F.3d 490, 494 (7th Cir. 2013).[7]  Rule 8(a) is "generously construed in favor of joinder, * * * in part because [Rule 14] provides a separate layer of protection where it is most needed." United States v. Randazzo, 80 F.3d 623, 627 (1st Cir. 1996); see also United States v. Blanchard, 542 F.3d 1133, 1141 (7th Cir. 2008) ("We construe this rule broadly in the interest of conserving judicial resources and avoiding costly, duplicative trials.").

**2**

**Discussion**

There are three scenarios in which joinder of offenses in an indictment is proper:  "(1) if the offenses charged 'are of the same or similar character;' or (2) if the offenses charged 'are

---

[7] Rule 8(a) of the Federal Rules of Criminal Procedure has nearly identical language as our own Rule 8(a) of the Superior Court Rules of Criminal Procedure.  "This [C]ourt has stated previously that where the federal rule and our state rule of procedure are substantially similar, we will look to the federal courts for guidance or interpretation of our own rule." Henderson v. Newport County Regional Young Men's Christian Association, 966 A.2d 1242, 1246 (R.I. 2009) (quoting Crowe Countryside Realty Associates, Co., LLC v. Novare Engineers, Inc., 891 A.2d 838, 840 (R.I. 2006)).

based on the same act or transaction;' or (3) if the offenses charged are based on two 'or more acts or transactions connected together or constituting parts of a common scheme or plan.'"[8] State v. Day, 898 A.2d 698, 704 (R.I. 2006).

We have not as of yet encountered a joinder case with the same set of somewhat unusual procedural circumstances as are present here. The indictment charged defendant with ten counts; however, we must consider in our analysis that count 2 (conspiracy to commit murder), count 6 (carrying a dangerous weapon while committing a crime of violence), and count 10 (driving on a suspended license) were dismissed via Rule 48(a) prior to trial. Also, the trial justice granted defendant's motion for judgment of acquittal on counts 7 (using a firearm to commit a crime of violence) and 8 (carrying a pistol without a license) at the conclusion of the state's case. The remaining five counts included four charges stemming from August 4 (murder, robbery, conspiracy, carrying a firearm without a license), while the lone surviving count from the August 6 incident was count 9 (reckless driving). In its opposition to the Rule 8 motion, the state argued before the trial justice that the red gun was the common element between the two offenses and that it was essential evidence. The state contended that the red gun was the single piece of evidence that led to the identification of defendant in the murder investigation and that it provided probable cause to arrest Brown. Admittedly, at first blush, counts 1, 3, 4, and 5 do not appear to be of a sufficiently similar character with count 9 to make joinder proper under Rule 8(a). In our opinion, however, determination of this issue requires us to define the point in time that is critical to a Rule 8 analysis.

---

[8] Rule 8(a) states that "[t]wo (2) or more offenses may be charged in the same indictment, * * * if the offenses charged * * * are of the same or similar character or are based on the same act or transaction or on two (2) or more acts or transactions connected together or constituting parts of a common scheme or plan."

When the language of a rule is clear and unambiguous, this Court must give the words of the rule their plain and ordinary meanings. See Golderese v. Suburban Land Co., 590 A.2d 395, 397 (R.I. 1991). Rule 8(a) states that "[t]wo (2) or more offenses" may be included in the "same indictment" if those offenses meet any of the above three scenarios. Although this discrete issue has not been previously addressed by this Court, questions of joinder under Rule 8(a) in several circuit courts of appeal examine only the propriety of the indictment itself. See, e.g., Berg, 714 F.3d at 495 ("Further in assessing whether joinder was proper, we look solely to the face of the indictment and not to the evidence adduced later at trial." (quoting United States v. Lanas, 324 F.3d 894, 899 (7th Cir. 2003))); United States v. Locklear, 631 F.3d 364, 368 (6th Cir. 2011) ("Whether joinder was proper under Rule 8(a) is determined by the allegations on the face of the indictment." (quoting United States v. Chavis, 296 F.3d 450, 456 (6th Cir. 2002))); United States v. Jawara, 474 F.3d 565, 578 (9th Cir. 2007) ("[T]he bottom line is that the similar character of the joined offenses should be ascertainable—either readily apparent or reasonably inferred— from the face of the indictment."). We agree in principle with this approach and will look to the charges and allegations that are contained in the indictment, perhaps supplemented by a bill of particulars, and not only to those offenses that the jury considered, to determine if joinder under Rule 8(a) was proper.

To analyze whether joinder was proper as a "same or similar character" offense, "we examine the base offenses charged, the location and time of the offenses, whether the offenses occurred within a close time span, the similarity of the victims, and the modus operandi of the offenses."[9] Pereira, 973 A.2d at 25. Although the two events in this case did occur within forty-eight hours of each other, they did not occur in the same location, there was no similarity of

---

[9] In State v. Pereira, 973 A.2d 19, 26 (R.I. 2009), we cautioned that this Court had never held that "the passage of time, standing alone, is determinative of the issue of joinder."

victims, and there was no discernible modus operandi. However, the "base offenses" charged share not only similarity, but counts 5 and 8 are precisely the same: carrying a pistol without a license.

Viewing this case through that lens, and mindful that the law favors joinder, we are convinced that joinder was proper pursuant to two of the considerations under a Rule 8(a) analysis: "same or similar character" and "two * * * or more * * * transactions connected together."

On appeal, defendant renews the argument that he pressed before the trial justice, that none of the scenarios for Rule 8(a) joinder is present here. The state counters that joinder is proper under a "same or similar character" analysis, which is the same rationale that the trial justice relied upon when he denied defendant's motion to sever under Rule 8(a). He reasoned:

> "With respect to Rule 8 joinder, our Supreme Court has spoken obviously on many occasions as to the test on joinder. I would more recently look at the Day case, 898 A.2d 698 (2006). There was a consolidation of two indictments of robbery, one of which included a gun; one did not. The Court indicated, '[w]e repeatedly have held that offenses of varying degrees of similarity are sufficiently "of the same or similar character."' It cited the Hernandez case with a parenthetical, '(marshaling [sic] the fact that four charges were all "of an assaultive nature" and that "the fifth offense, unlawful possession of a firearm, is attributed to the tool used to perpetrate the violence.").' That's precisely what we have here. Motion to sever is denied."

Although we agree with the trial justice's ultimate conclusion, we arrive at our decision by employing a separate and somewhat different line of reasoning.

In Day, 898 A.2d at 703, this Court held that the joinder of two separate indictments for two robberies involved incidents of a sufficiently similar character because "[b]oth incidents involved the same base criminal offenses: robbery and conspiracy to commit robbery." Moreover, both offenses occurred "within close proximity in downtown Providence, within a

two month time span, at a similar time of day, and the victims were close in age." Id. Finally, the defendant used a similar modus operandi in conducting the robberies. Id. In Hernandez, 822 A.2d at 918, this Court held that the joinder of three indictments for five offenses was proper under "the same or similar character" scenario because, in each of three sexual assaults or attempted sexual assaults, the defendant had picked up women and used force against them to demand sex and/or money. Hernandez also involved a firearm that was used for two of the incidents, but not the third. Id. Although the trial justice correctly noted that the defendants in Day and Hernandez used a firearm to perpetrate their offenses in some incidents but not others, this Court did not rely upon that fact to support Rule 8 joinder. Instead, the Court focused on the similarity of the offenses and the methods used to perpetrate them to find joinder to be proper under Rule 8(a).

In Pereira, 973 A.2d at 25 n.5, this Court adopted the "broader" approach as articulated by the First and Ninth Circuits when addressing "same or similar character" joinder questions. In addition to the factors we outlined in Pereira, the Ninth Circuit also considers "the likelihood and extent of evidentiary overlap." Jawara, 474 F.3d at 578. However, even this approach recognizes that mere evidentiary overlap is not dispositive. See Randazzo, 80 F.3d at 628 ("Congress did not provide for joinder for unrelated transactions and dissimilar crimes merely because some evidence might be common to all of the counts."). The indictment alleged that Brown had been in possession of a red firearm during each incident. Moreover, at trial, two witnesses stated that the pistol that the police recovered after the August 6 incident was uniquely akin to the one that had been observed during the beating and robbery of Restrepo. Thus, the key piece of evidence, the red firearm, had a strong likelihood of overlap between both the August 4 and August 6 incidents.

- 13 -

Secondly, joinder was proper because the two "transactions" were "connected together." In State v. Cline, 122 R.I. 297, 329, 405 A.2d 1192, 1209 (1979), the defendant escaped from the Adult Correctional Institutions and, while at large, committed murder. Although the facts of Cline are not analogous to the present case, we did discuss in that case that the "connected together" scenario for joinder applied when evidence of one event would overlap for a second event. Id.; see also United States v. Richardson, 161 F.3d 728, 734 (D.C. Cir. 1998) ("Where there is substantial overlap in evidence between two offenses, joinder 'eliminate[s] the need to prove substantially the same evidence twice over, thus realizing precisely the kind of economy envisaged by Rule 8(a).'" (quoting Blunt v. United States, 404 F.2d 1283, 1288 (D.C. Cir. 1968))). Here, the red gun would have been admissible at separate trials for the two separate offenses of carrying a firearm without a license. In our opinion, this is a strong argument favoring joinder under Rule 8(a).

The defendant maintains that this Court's decision in State v. Trepanier, 600 A.2d 1311 (R.I. 1991), in which we decided Rule 8 joinder was inappropriate, is analogous to the present case. We disagree. In Trepanier, the defendant had been charged with twenty-seven offenses, some of which stemmed from sniping and others from a later spree of offenses for breaking and entering and arson. Id. at 1315. The Court concluded that joinder was improper because none of the Rule 8(a) justifications was sufficiently present to permit joinder. Trepanier, 600 A.2d at 1316. However, we are convinced joinder was proper here because Rule 8(a) determinations focus on the charges in the indictment and not the offenses of which defendant was ultimately convicted.

**Rule 14 Severance**

The defendant next argues that even if the offenses were properly joined under Rule 8(a), the trial justice abused his discretion when he denied defendant's Rule 14 motion to sever the August 4 offenses from the August 6 offenses. The defendant contends that joinder of both sets of offenses resulted in real and substantial prejudice to him because the jury inferred that he had a criminal disposition, and the joinder resulted in cumulating evidence of guilt. At trial, the trial justice denied defendant's motion to sever because:

> "I'm satisfied fully that there's a clear nexus between the defendant's alleged possession of the firearm on the 6th of August to the events that allegedly occurred on the 4th of August. The description of the gun is peculiar in that it was a red gun in each instance, and it links, as the [s]tate would claim, the defendant's presence on the 4th with that red gun. Identification becomes important and is relevant in that regard."

**1**

**Standard of Review**

The decision to sever joined counts against a defendant as authorized by Rule 14 "is not a matter of right, but rather is confided to the sound discretion of the trial justice." Kluth, 46 A.3d at 875. This Court will not disturb a trial justice's decision regarding a Rule 14 motion to sever absent a clear abuse of discretion. Kluth, 46 A.3d at 875 (citing Pereira, 973 A.2d at 27-28). "It is not enough simply to show that joinder makes it more difficult [for the defendant] to defend." State v. Goulet, 21 A.3d 302, 309 (R.I. 2011) (quoting State v. Lassor, 555 A.2d 339, 346 (R.I. 1989)). We will overturn a trial justice's Rule 14 severance determination only when a defendant has shown "that the trial justice's denial of the motion to sever prejudiced the defendant to such a degree that he or she was denied a fair trial." Goulet, 21 A.3d at 309 (quoting Pereira, 973 A.2d at 28). More importantly, "in cases in which the outcome would have

been the same had separate trials been held, we will not disturb the trial justice's decision not to sever, even when the defendant may have suffered some disadvantage in defending against the joined counts simultaneously." State v. Rice, 755 A.2d 137, 144 (R.I. 2000).

**2**

**Discussion**

Our holding that Rule 8(a) joinder in this case was proper does not end the inquiry into whether all the charges brought against defendant should have been tried together. See State v. King, 693 A.2d 658, 663 (R.I. 1997). Brown correctly points out that, even if joinder under Rule 8 is proper, "a defendant may nonetheless be prejudiced to such an extent that relief from joinder is appropriate under Rule 14." Goulet, 21 A.3d at 309. Rule 14 provides that "[i]f it appears that a defendant or the [s]tate is prejudiced by a joinder of offenses * * * the court may order an election or separate trials of counts * * * or provide whatever other relief justice requires."

We determine whether the defendant has demonstrated substantial prejudice by balancing "efficiency and convenience in judicial administration on the one hand and the defendant's right to a fair trial without prejudice on the other." Pereira, 973 A.2d at 28 (quoting Day, 898 A.2d at 705). Even though the burden to establish the presence of substantial prejudice lies with the defendant, demonstrating substantial prejudice is not an insurmountable obstacle. "[P]rejudice may result from 'a latent feeling of hostility engendered by the charging of several crimes as distinct from only one.'" Id. (quoting Day, 898 A.2d at 705).

In his effort to convince us that he has shown substantial prejudice, defendant maintains that the evidence presented by the state was not mutually admissible; therefore, he argues, the jury was exposed to highly prejudicial information from which it could infer that he possessed a criminal disposition. The defendant stresses that because possession of a gun was not an element

- 16 -

of the charges stemming from either incident, nor was a firearm used in the commission of either offense, the evidence of the red gun would not have been admissible at separate trials. The state counters that evidence of Brown's flight from police on August 6 would have been admissible evidence of consciousness of guilt. Further, the state argues, the jury would likely have heard in a separate trial how the police came to obtain the red firearm, accompanied by the testimony about the unusual nature of the pistol.

We are not convinced that the trial justice abused his discretion in denying the motion to sever under Rule 14. Although there may be other possible reasons that defendant fled from the police, such as the fact that he was on bail for two separate felonies, possession of cocaine and robbery, and the fact that he was driving a vehicle that had a loaded firearm inside it, the flight may well have been probative of his consciousness of guilt for the murder and robbery of Restrepo, which, after all, had occurred just two days earlier and had been witnessed by several bystanders. See State v. Bishop, 68 A.3d 409, 423 (R.I. 2013) (The defendant's failure to report to his parole officer was "probative of his consciousness of guilt."). Had the counts been severed, the evidence of the car chase on August 6 would almost certainly have been admitted in a trial for the August 4 incident to manifest consciousness of guilt. See United States v. Stackpole, 811 F.2d 689, 694 (1st Cir. 1987).

Furthermore, evidence of the rare red gun would have likely been mutually admissible in separate trials under the provisions of Rule 404(b) of the Rhode Island Rules of Evidence. It is axiomatic that "Rule 404(b) prohibits the use of evidence of past crimes, wrongs, or acts 'to show the defendant's propensity to commit the crime with which he is currently charged.'" State v. Rodriguez, 996 A.2d 145, 150 (R.I. 2010) (quoting State v. John, 881 A.2d 920, 926 (R.I. 2005)). However, Rule 404(b) makes it "equally plain" that such evidence may be admissible

for other purposes such as identity. Rodriguez, 996 A.2d at 150. At the time of the hearing on defendant's Rule 14 motion to sever, the firearm counts relating to the August 6 incident, counts 7 and 8, accusing defendant of using a firearm to commit a crime of violence and carrying a pistol without a license, were each "live issues" because they had not yet been disposed of pursuant to Rule 29. The trial justice indicated as much, observing that identification was an important issue and relevant to the case. In our opinion, it was not error to conclude that evidence of the red firearm would have been mutually admissible at separate trials. We have stated previously that "[w]here evidence of one crime would be admissible at a separate trial of another charge, a defendant will not suffer any additional prejudice if the two charges are tried together." Cline, 122 R.I. at 329, 405 A.2d at 1209 (quoting McKnight v. State, 375 A.2d 551, 555 (Md. 1977)); see also State v. Cofield, 605 A.2d 230, 234 (N.J. 1992) ("[T]he distinctive features of a silver pistol used in a prior crime would be admissible under [Rule 404(b)] in an unrelated murder trial to establish either the identity of the perpetrator or the weapon used.").

It is unlikely that testimony relating to charges arising from the police chase prejudiced the jurors, deciding the more serious charges emanating from the August 4 incident, to such a degree that they would improperly draw an inference that defendant must be guilty of the murder and robbery of Restrepo. Without question, the testimony relating to the reckless driving was secondary compared to the graphic testimony surrounding Restrepo's murder. The August 6 evidence would have represented "only a tiny fraction of the testimony heard by the jury, and did not involve conduct any more sensational or disturbing than the crimes with which [the defendant] was charged." United States v. Roldan-Zapata, 916 F.2d 795, 804 (2d Cir. 1990).

We are equally unpersuaded by defendant's second contention that the trial justice abused his discretion by denying the motion to sever because joinder likely caused the jury to cumulate

evidence from the two crimes when it would not have done so had the offenses been tried separately. Even though at the close of the evidence the reckless driving charge was the only remaining offense emanating from the August 6 police chase, the trial justice did provide a specific instruction to the jury members reminding them of their duty to consider each offense separately as well as a reminder that the state has the burden of proving each offense beyond a reasonable doubt. Although the evidence of the red pistol is common to both incidents, this and other evidence were not so intertwined and complex that it would likely confuse the jury or provide incentive for the jurors to cumulate evidence. See United States v. Riccardi, 258 F. Supp. 2d 1212, 1231 (D. Kan. 2003).

## C

### The Police Sketch

The defendant asserts that the trial justice impeded his right to present a defense when he excluded a police sketch that he maintains did not resemble him from the jury's consideration. Late in the evening of August 4, 2008, a witness by the name of Efrain Benitez gave a statement to Det. Nathan McGarry of the Central Falls police department about what he had seen earlier that day. Benitez told the police that he had observed the attack on Restrepo, which took place directly outside his home on Watson Street. He described seeing two men assault Restrepo, indicating that he got a good look at one and saying that "[t]he big one was black, very dark skinned, tall and skinny. His hair was covered with a black cover." He also said that he thought he would be able to recognize the "big black guy again." Based on that discussion, the Central Falls police called upon Linda Eastman, a sketch artist and retired Warwick police captain, to produce a likeness of the assailant based on Benitez's description.

However, by the time the matter was reached for trial, Benitez could not be called as a witness because he could not be located. Nonetheless, defendant attempted to call Capt. Eastman as a witness in an effort to offer her sketch as an exhibit because, Brown claimed, the sketch did not resemble him, and it, therefore, would be probative information for the jury. Obviously, defendant sought to introduce the sketch to rebut the eyewitness identification by Diego Rodriguez. The defendant argued that the sketch was admissible for two reasons. First, he claimed that the sketch could be introduced under Rule 804(b)(5) of the Rhode Island Rules of Evidence, the "catch-all" exception to the hearsay rule.[10] Secondly, defendant maintained that the sketch was admissible under Rules 702 and 703 of the Rhode Island Rules of Evidence because, he maintained, Capt. Eastman was positioned to provide expert testimony. The trial justice did not agree; he excluded the sketch categorizing it as hearsay because, without Benitez's testimony, it did not "in any way carry the imprimatur of trustworthiness that exceptions to the hearsay rule require." Further, the trial justice did not allow Capt. Eastman to testify as an expert witness because her expertise was not similar to that of a doctor, who forms her opinion to render a diagnosis or perform surgery.

On appeal, defendant first contends that the sketch itself is not hearsay because hearsay requires a statement and a sketch is not a statement. Alternatively, defendant renews his arguments below that the sketch, even if properly characterized as a statement, is admissible as an exception to the hearsay rule under Rule 804(b)(5). Further, he maintains that the sketch was

---

[10] Rules 803(24) and 804(b)(5) of the Rhode Island Rules of Evidence are both considered "catch-all" exceptions to the hearsay rule. The defendant asserted Rule 804(b)(5) in this case because Benitez was an unavailable witness. See Martinez v. Kurdziel, 612 A.2d 669, 673-74 (R.I. 1992) ("Rule 803(24) is the catchall provision when the unavailability of a witness is not required, and Rule 804(b)(5), the catchall provision when the witness is unavailable according to specific enumerated categories.").

admissible under Rule 702 because Capt. Eastman was an expert in her field. We do not agree with defendant's arguments.

**1**

**Standard of Review**

This Court reviews a trial justice's decisions on the admission of evidence by employing an abuse-of-discretion standard. State v. Young, 78 A.3d 787, 792 (R.I. 2013) (citing State v. Evans, 742 A.2d 715, 719 (R.I. 1999)). We will uphold the trial justice's decision "unless the trial justice abused his or her discretion and the admission of irrelevant evidence was prejudicial to a defendant's rights." Id. (quoting Evans, 742 A.2d at 719). Thus, there is no abuse of discretion provided some reasoning supporting the trial justice's decision appears in the record. Id.

**2**

**Discussion**

Rule 801(c) of the Rhode Island Rules of Evidence defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801(a) defines a "statement" as "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." The defendant contends that the police sketch is not hearsay because it is not a statement. To support this reasoning, defendant claims that the sketch is the functional equivalent of a photograph, which does not amount to an assertion and is therefore not hearsay.

Several courts have addressed whether a police sketch is hearsay, and there is a lack of unanimity on the issue. The Second Circuit concluded that the introduction of a police sketch by the government was not a "statement" and "therefore can no more be 'hearsay' than a

- 21 -

photograph identified by a witness." United States v. Moskowitz, 581 F.2d 14, 21 (2d Cir.), cert. denied, 439 U.S. 871 (1978). Although, in that case, the court concluded the sketch was not hearsay, the court did go on to say that the sketch was not admitted as a statement by the sketch artist, but to show the likeness the declarants had testified to at trial. Id. Also, extensive testimony at trial established that the police sketch introduced into evidence was the same sketch that the declarants identified and had helped produce. Id. Thus, and significantly, the declarants not only testified at the trial but they also properly authenticated the sketch. In contrast, the Court of Appeals of New York has long held that not only are composite sketches hearsay, but also, in most circumstances, merely mentioning that a witness worked with a police sketch artist is unduly prejudicial. See People v. Maldonado, 769 N.E.2d 1281, 1285-86 (N.Y. 2002) (describing the court's precedents finding police sketches to be hearsay). Notably, for our purposes, that case also holds that "[a] composite sketch 'may not be admitted simply to counteract evidence * * * which casts doubt on the reliability of [a] complainant's identification.'" Id. at 1286 (quoting People v. Falterman, 424 N.Y.S.2d 481, 482 (N.Y. App. Div. 1980)).

Although defendant urges this Court to conclude that police sketches are not hearsay, we need not reach that issue to determine if the trial justice abused his discretion by excluding the sketch. The primary difficulty here, where it is not disputed that the declarant was unavailable, is one of authentication. The defendant argues that the police sketch should be treated as a photograph, but a photograph is received into evidence only after a witness with personal knowledge testifies that it is a true and accurate representation. See State v. Carvalho, 892 A.2d 140, 148 (R.I. 2006). Also, in the context of other illustrations such as maps, we have held that they are admissible if "shown to be reasonably accurate." State v. Phannavong, 21 A.3d 321,

324 (R.I. 2011) (quoting State v. Greene, 74 R.I. 437, 443, 60 A.2d 711, 715 (1948)).  More importantly, there is a significant distinction between a photograph, which is a visual record, and a sketch, which is an artist's rendering based only on statements and direction from an eyewitness.  We cannot conceive of a situation in which Capt. Eastman would be able to properly authenticate the accuracy of the sketch without resorting to hearsay because, at the time she drew the sketch, she had no personal knowledge of the appearance of the assailant.

The defendant next argues that, even if the sketch is hearsay, the trial justice erred in excluding it because the sketch was admissible under Rule 804(b)(5) or the "catch-all" exception.  "Under Rule 804(b)(5)(B), an out-of-court statement made by an unavailable witness can be admitted to prove the truth of the matter asserted, if, among other requirements, 'the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts.'"  State v. Briggs, 886 A.2d 735, 750 (R.I. 2005).  As defendant correctly points out, we have held previously, "[i]n each case where Rule 804(b)(5) is invoked, the court is essentially creating a new exception to the hearsay rule.  If the hearsay rule is to retain any life, a demand for the creation of a new exception counsels caution and should be granted only where special 'trustworthiness' is shown."  Estate of Sweeney v. Charpentier, 675 A.2d 824, 827 (R.I. 1996) (emphasis omitted) (quoting Wolfson v. Mutual Life Insurance Co., 455 F. Supp. 82, 88 (M.D. Pa.), aff'd, 588 F.2d 825 (3d Cir. 1978)).  Although we have no reason to doubt that Capt. Eastman faithfully complied to the best of her ability with the instructions of Benitez when she created the sketch, we cannot accept that there is an indication of special trustworthiness that would justify a conclusion that the trial justice abused his discretion when he declined to admit the sketch under this exception.

Alternatively, defendant argues that the sketch was admissible under Rules 702 and 703 because, he contends, Capt. Eastman was an expert. Rule 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of fact or opinion." The defendant argues that had Capt. Eastman been allowed to testify as an expert witness, Rule 703 would have permitted her to recount what Benitez had told her about the appearance of the assailant because those statements contained the information upon which she relied in creating the sketch.[11] The trial justice ruled that Capt. Eastman's ability to accurately represent pictographically what Benitez relayed to her was not comparable to the actions taken by a doctor in forming an expert opinion in order to render a diagnosis or perform surgery. We agree.

We have no doubt that Capt. Eastman has a great deal of skill and experience in creating a composite sketch; but, unlike a doctor, she cannot independently evaluate Benitez's description to provide the necessary level of trustworthiness or reliability normally contemplated under Rules 702 and 703. In other words, a doctor receives the history provided to him by a patient and then performs his own examination and diagnostic tests seeking objective conditions and symptoms. It is those findings, combined with his education and experience that allows the physician or other expert to render an opinion. Conversely, the sketch artist must rely solely upon the word of another person to produce his product. Therefore, we conclude that the trial justice did not abuse his discretion in declining to admit the police sketch or in disallowing the proposed testimony of Capt. Eastman.

---

[11] Rule 703 of the Rhode Island Rules of Evidence states that "[i]f of a type reasonably and customarily relied upon by experts in the particular field in forming opinions upon the subject, the underlying facts or data shall be admissible without testimony from the primary source."

Brown contends that the trial justice impaired his right to a fair trial when he overruled defendant's objection to the admission of three autopsy photographs presented during the testimony of the state's medical examiner, Doctor Alexander Cherkov. During his testimony, Doctor Cherkov informed the jury that he had conducted an autopsy on Restrepo, a procedure that included both internal and external examinations. Doctor Cherkov testified that during the external examination of Restrepo's body, he found bruises and abrasions on Restrepo's head indicating a hemorrhage from blunt-force trauma as well as increased mobility of Restrepo's neck, indicating possible fractures of the upper vertebrae. Doctor Cherkov testified that he then conducted an internal examination, which involved retraction of the skin on the skull and then the opening of the skull so that he could examine the brain. After retracting the skin, Doctor Cherkov found a subgaleal hemorrhage, which is bleeding between the scalp and the skull, in the left temporal area. Doctor Cherkov next examined Restrepo's brain, finding a diffuse subarachnoid hemorrhage, which is bleeding from small blood vessels that cover the brain and provide blood to the brain's cortex. Finally, Doctor Cherkov testified that Restrepo died from blunt-force trauma to the head, and that his wounds were consistent with a homicide.

The defendant objected to three of the eight photographs from the autopsy that the state wished both to introduce as evidence and to display in the courtroom. The defendant, citing Rule 403 of the Rhode Island Rules of Evidence argued that because the cause of death was not in dispute, whatever limited probative value the photos would provide was outweighed by their prejudicial effect. The photographs, defendant argued, depicted the victim's remains in the aftermath of the autopsy, and not just the physical damage that defendant was alleged to have

inflicted. The trial justice overruled the objection and found the photos were not overly prejudicial. He reasoned that this Court's precedents favor admission of photographs, even if they are unpleasant and that the photos were probative and relevant because they assisted the medical examiner in explaining his testimony.

In addition, after overruling the objection, the trial justice imparted the following instruction to the jury:

> "You'll remember, folks, when we started the trial, you were forewarned that there would be some unpleasant evidence that you would have to look at. We are at the point where you will now be looking at some of that unpleasant evidence. They are autopsy photographs. And I remind you of your obligations, and that is to say that you are fact finders. You are not to be distracted by what you see in the photographs, such that you [lose] sight of your ultimate goal, which is to determine if that which you see in the photographs here from the medical examiner are injuries that were caused by the man on trial. You have to make that determination from all the evidence that is submitted to you, and you must not be so distracted or impassioned about these photographs that you lose sight of the ultimate goal that you must accomplish in an impartial and detached manner."

The state then displayed each of the photographs on a projector while Doctor Cherkov used a laser pointer to explain his medical findings.

## 1

### Standard of Review

We review a trial justice's decisions on admissibility of photographs under an abuse-of-discretion standard. See State v. Carter, 744 A.2d 839, 847 (R.I. 2000) ("A trial justice has wide discretion to determine the materiality and relevance of crime-scene and murder-victim photographs."). "[D]etermining the relevance of photographs is within the sound discretion of the trial justice." State v. Belloli, 766 A.2d 928, 930 (R.I. 2001) (quoting State v. Spratt, 742 A.2d 1194, 1198 (R.I. 1999)).

**2**

**Discussion**

When, as here, a defendant challenges the admission of photographs under Rule 403, "[o]ur function is to review the record and to determine whether the trial justice carefully considered whether the probative value of the evidence was outweighed by undue prejudice, 'keeping in mind that even if the evidence offered * * * might tend to influence the jury unduly, it may nevertheless be admissible if it is otherwise material and competent." Belloli, 766 A.2d at 930 (quoting Spratt, 742 A.2d at 1198). We determine whether the photograph is "of such a nature as to inflame the jurors and therefore prejudice them beyond the ordinary prejudice that is always sustained by the introduction of relevant evidence intended to prove guilt." State v. Beauchamp, 671 A.2d 1238, 1241 (R.I. 1996) (quoting State v. Fenner, 503 A.2d 518, 526 (R.I. 1986)). Therefore, we will not overturn a trial justice's determination unless the evidence is "marginally relevant and enormously prejudicial." State v. Pona, 66 A.3d 454, 466 (R.I. 2013) (quoting State v. Smith, 39 A.3d 669, 675 (R.I. 2012)).

"A photograph is relevant if it has a tendency to 'prove or disprove some material fact in issue.'" State v. Rivera, 640 A.2d 524, 526 (R.I. 1994) (quoting State v. Correia, 600 A.2d 279, 285 (R.I. 1991)). Autopsy photographs, like those from crime scenes or of murder victims may be difficult for jurors to see, "yet this Court has recognized that because it is the state's burden to prove each element of a crime beyond a reasonable doubt, such photographs are unquestionably relevant to its need to do so." Carter, 744 A.2d at 847 (citing State v. Ellis, 619 A.2d 418, 424 (R.I. 1993)). However, photographs of a murder victim should be excluded if "offered solely to inflame the passions of the jury * * * ." Id. (emphasis omitted).

The defendant offers a more nuanced argument than those that we have considered previously. First, defendant did not challenge the inclusion of all eight of the photographs of the victims, but only the three that defendant argues are particularly gruesome. The first, exhibit 10, depicts the victim's neck, shoulders, and head with his skin peeled back over his skull and hair protruding from the folded over skin from his scalp. The second and third, exhibits 11 and 12, depict the victim's brain, one after the top of the skull has been cut away and the other with the brain removed from the skull and placed by itself on a towel. Moreover, defendant maintains that because the cause of death was not in dispute, the photos served no purpose but to inflame the jury.

Although the photographs in question are disturbing to the point of being grisly, we cannot conclude that the trial justice abused his discretion by admitting them. Very few courts have addressed a situation similar to the one with which we are presented here, where only some of the photographs are challenged and the cause of death is not in dispute. The Supreme Court of Kansas has dealt with a similar set of arguments on multiple occasions with varying results. In State v. Boyd, 532 P.2d 1064, 1068 (Kan. 1975), the defendant had challenged but one photograph of fourteen offered, and he did not challenge the cause of death. The court held that that one picture was so gruesome that its admission was an abuse of discretion because several other photos had already demonstrated the medical testimony of the medical examiner, leading the court to conclude the challenged photo was offered solely to inflame the jury. Id. ("[E]xhibit 39 showed the body of the deceased cut open from chin to groin and laid out like a disemboweled beef in a packing plant."). Although the Kansas Supreme Court never specifically overruled Boyd, there was not another finding of an abuse of discretion with respect to autopsy photographs until two cases in the 1990's, in which the defendants challenged only one or two

autopsy photos and the manner of death was not disputed. See State v. Sherrer, 912 P.2d 747, 756 (Kan. 1996) ("After reviewing the other photographs, we fail to see the necessity for admitting into evidence repetitious photographs which, in addition to demonstrating the angle of penetration, also showed the effect of the autopsy on the deceased's body."); State v. Adam, 896 P.2d 1022, 1032 (Kan. 1995) ("There seems to be no probative value to Exhibit 7G. * * * [T]he heart has been pulled out of the chest cavity and cut open to show a cross-section."). However, other courts have noted that stipulating to the cause of death does not lead to an automatic exclusion of the autopsy photographs. See State v. Frazier, 652 N.E.2d 1000, 1010 (Ohio 1995) ("[T]he fact that appellant stipulated the cause of death does not automatically render the photographs inadmissible." (quoting State v. Maurer, 473 N.E.2d 768, 792 (Ohio 1984))).

There certainly are similarities between those cases and this one; however, as disturbing as the exhibits may be, we are satisfied that the trial justice did not abuse his discretion because the state presented photographs to the jury which did serve as visual aids to explain Doctor Cherkov's testimony about the effect of the blunt-force trauma on the victim's skull and brain. Exhibit 10 is likely the most gruesome of the three, and it is the one we have most carefully considered, but even that photograph assists in the understanding of Doctor Cherkov's testimony about the subgaleal hemorrhage suffered by the victim. As we held in State v. Winston, 105 R.I. 447, 450, 252 A.2d 354, 356 (1969), photographs are "admissible into evidence as an aid to the jury in arriving at a proper understanding of the evidence as proof of the corpus delicti, the extent of injury, [and] the condition and identification of the body * * * ." We are unable to conclude that the trial justice abused his discretion when he ruled that the state did not present these photographs solely to inflame the passions of the jury because, even though the cause of death was not in dispute, the state still bore the burden of proving every element of the case beyond a

reasonable doubt. Moreover, the trial justice instructed the jury about the unpleasant images that the state was about to show before he allowed the state to display the photographs as well as reminding them of each juror's duty to not be distracted or "impassioned" by the photographs. See Commonwealth v. Phinney, 622 N.E.2d 617, 624 (Mass. 1993) ("Admission of the photographs was within the judge's discretion, and the judge furnished adequate instructions to the jury to guide their consideration of the evidence."). We are therefore of the opinion that there was no error in their admission.

**E**

**Rule 33 Motion for a New Trial**

Also before us on appeal is the trial justice's denial of defendant's motion for a new trial under Rule 33. After the jury returned a verdict of guilty on the five counts submitted to it, defendant filed a motion for a new trial. After hearing arguments, the trial justice characterized the case as "devolv[ing] itself into a credibility debate." The trial justice weighed the evidence and made credibility determinations about both Diego Rodriguez and defendant's alibi witnesses. After reviewing the evidence, the trial justice found that the jury's verdict was "not at all unreasonable" and denied defendant's motion.

**1**

**Standard of Review**

When a defendant files a motion for a new trial under Rule 33, "the trial justice does not favor the state's evidence, but 'use[s] independent judgment to weigh the evidence and assess the credibility of the witnesses.'" State v. Fleck, 81 A.3d 1129, 1133 (R.I. 2014) (quoting State v. Pineda, 13 A.3d 623, 640 (R.I. 2011)). When the trial justice rules on a motion for new trial, he uses "independent judgment on the credibility of witnesses and on the weight of the evidence."

State v. Imbruglia, 913 A.2d 1022, 1028 (R.I. 2007) (quoting State v. Banach, 648 A.2d 1363, 1367 (R.I. 1994)). "Specifically, 'the trial justice must (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury.'" State v. Heredia, 10 A.3d 443, 446 (R.I. 2010) (quoting State v. Texieira, 944 A.2d 132, 140 (R.I. 2008)).

During the hearing on the Rule 33 motion, the trial justice considered the evidence that had been presented at trial in the context of the jury instructions, noting that the jury accepted Rodriguez's account and eyewitness identification of defendant. He then considered the red-gun evidence, which he said "tended to corroborate Rodriguez's testimony." The trial justice weighed the credibility of the witnesses, determining that Rodriguez was "firm and steadfast," and contrasting the alibi witnesses for defendant as having sung similar songs, but concluding that they were "off key."

The defendant argues that the trial justice was clearly wrong in his assessment of the witnesses because Rodriguez used a "purported language barrier" to gain more time to formulate his answer and was generally nonresponsive to defense counsel's cross-examination questioning. However, "[t]his Court is loath to overturn the credibility findings of a trial justice because 'it is the trial justice who has the opportunity to observe the witnesses as they testify and therefore is in a better position to weigh the evidence and to pass upon the credibility of the witnesses than is this [C]ourt.'" State v. Richardson, 47 A.3d 305, 318 (R.I. 2012) (quoting Penhallow v. Penhallow, 725 A.2d 896, 897 (R.I. 1998) (mem.)).

Finally, the trial justice did not say whether he agreed with the jury's verdict or not, but he did declare that he found the jury's verdict to be "not at all unreasonable." Although we may

have preferred the trial justice to more fully articulate his agreement or disagreement with the verdict, our review of the entirety of his ruling on the motion makes it plain to us that he did not disagree with the jury's verdict. The trial justice's denial of the motion for new trial was not clearly wrong, and we see no basis for disturbing his decision.

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of conviction in this case. The record shall be returned to the Superior Court.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**         State v. Kayborn Brown.

**CASE NO:**         No. 2011-257-C.A.
                            (P1/09-622AG)

**COURT:**         Supreme Court

**DATE OPINION FILED:**   April 11, 2014

**JUSTICES:**         Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**         Associate Justice Francis X. Flaherty

**SOURCE OF APPEAL:**   Providence County Superior Court

**JUDGE FROM LOWER COURT**:

                            Associate Justice Robert D. Krause

**ATTORNEYS ON APPEAL:**

                            For State:  Jane M. McSoley
                                        Department of Attorney General

                            For Defendant:  Catherine Gibran
                                        Office of the Public Defender