**STATE**

v.

**Brian LIONBERG.**

**No. 86–7–Appeal.**

Supreme Court of Rhode Island.

Dec. 4, 1987.

James E. O'Neil, Atty. Gen., Thomas Dickinson, Annie Goldberg, Asst. Attys. Gen., for plaintiff.

William Reilly, Public Defender, Barbara Hurst, Paula Rosin, Asst. Public Defenders, for defendant.

## O P I N I O N

MURRAY, Justice.

This case comes before us on appeal from a judgment in the Superior Court finding the defendant, Brian Lionberg, guilty of murder in the first degree of Mary Burroughs (decedent) and imposing a life sentence as required by statute, to run consecutively with a life sentence being served in the State of Kansas.

The record before us indicates that on February 28, 1984, neighbors noticed that the outside and inside lights of Mary Burroughs' house were on all night. The neighbors notified Mrs. Burroughs' relatives since she had recently been widowed, lived alone, and was seventy years of age. Three relatives arrived at the house and discovered the decedent in a closet of a back bedroom. According to the medical examiner, decedent had bled to death from multiple stab wounds. Nothing in the house had been disturbed, and there were no signs of forced entry. The decedent's car, a 1981 two-door blue Grand Prix with Rhode Island registration number B–378, was missing from the garage; and parked approximately 150 yards away from the house was a 1971 Pontiac Lemans, registered to Brian Lionberg. The defendant's roommate, Matthew Iadeluca, testified that he had seen defendant driving decedent's car at 8 p.m., on February 27, 1984. Later that evening Iadeluca returned to his apartment and noticed that food and clothes were missing and a large sum of money was gone from his room. He found a note from the defendant that read, "Everything I'll triple, send in the mail." Also, Iadeluca found a receipt on defendant's dresser for a shotgun and shells bought the day before.

Relying on this information, the East Greenwich police secured an arrest warrant and posted a bulletin for Lionberg's arrest on the National Crime Information Computer system.

According to the record, defendant had headed west, and on Friday, March 2, 1984, he was driving on Interstate Highway 70 in Kansas. Lionberg stopped at a rest area, murdered a forty-three-year old man, and took his wallet and gold wedding band.[1] The following morning, Saturday, March 3, 1984, defendant started out traveling further west on Interstate 70. Suddenly, the defendant turned the car around and traveled east, at which time Trooper Michael Hover of the Kansas Highway Patrol no-

1. On July 2, 1984, defendant pleaded guilty to this charge and received a life sentence in Kansas.

ticed the blue Grand Prix speeding at seventy miles per hour. Trooper Hover activated his flashing lights, defendant responded by increasing his speed to approximately ninety miles per hour, and a chase then ensued for twenty miles. Hover was informed by the dispatcher that the car was stolen and wanted in connection with a homicide. The trooper, with the assistance of other officers, was finally able to stop the car by firing two shotgun rounds into the tires.

The defendant was arrested and given his *Miranda* rights by Trooper Hover, and the car was impounded. Subsequent investigation and a search of the car provided evidence linking defendant to the Kansas homicide.

In Rhode Island, defendant was charged with the murder of Mary Burroughs, the burglary of Mrs. Burroughs' home, and larceny of goods valued over $500 (the Grand Prix). Various pretrial motions were heard and denied during March and April of 1985, and on April 26, 1985, trial commenced before a jury. On May 2, 1985, defendant's motions for judgments of acquittal on the charges of burglary and larceny were granted. On May 3, 1985, the jury returned a verdict of guilty of first-degree murder, and defendant was sentenced to life imprisonment to run consecutively with the sentence in Kansas. On May 8, 1985, defendant's motion for new trial was denied.

The defendant first contends that the trial justice erred in denying defendant's pretrial motion to suppress incriminating statements made to the Kansas and East Greenwich police. Second, he claims that the trial justice erred in finding that defendant knowingly, intelligently, and voluntarily waived his constitutional rights under the totality of circumstances. Third, he claims that the trial justice erred in denying defendant's motion to suppress incriminating statements on the grounds that his statements were induced by an unreasonable delay in presenting him for arraignment. Fourth, he claims that the Superior Court justice erred in denying defendant's motion to dismiss the indictment on the grounds that the state had violated provisions of the Interstate Agreement on Detainers Act by failing to bring defendant to trial within 180 days following the request for disposition of the Rhode Island indictment. Fifth, he claims that the trial justice erred in overruling defendant's objection to the medical examiner's testimony. Sixth, he claims that the trial justice committed reversible error in allowing the state to introduce photographs of decedent. Additional facts will be supplied as needed in the discussion of these issues.

I

First, Lionberg filed a pretrial motion to suppress statements that he made to the Kansas and East Greenwich police following his arrest on Saturday, March 3, 1984. The defendant asserts that he invoked his rights to remain silent and to speak with counsel after his arrest on Saturday morning. He asserts that three separate violations occurred subsequent to the invocation of his rights. The defendant claims (1) that his discussion with Hollis Worthen (a corrections officer) that resulted in a confession to the Burroughs murder constituted an interrogation, thus violating his *Miranda* rights; and (2) defendant contends that the Kansas and East Greenwich police failed to honor scrupulously his rights to remain silent and to an attorney by questioning him after he invoked those rights. We do not agree with defendant's contentions.

Trooper Hover testified that immediately following Lionberg's arrest he apprised defendant of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Hover testified that he informed Lionberg that he was being held for possession of a stolen motor vehicle which was wanted in connection with a homicide. Upon arriving at the Salina County jail, Trooper Hover read Lionberg his *Miranda* rights for the second time. Hover asked Lionberg if he wanted to discuss the stolen motor vehicle. The defendant responded that he wanted to speak with an attorney and Hover ended the conversation.

Thereafter, according to Hover's testimony, Hover contacted the East Greenwich police and informed Detective Larry Campion that Lionberg was in custody. Campion inquired about defendant's feelings regarding extradition. Hover returned to the cell and reminded Lionberg of his rights. He then asked Lionberg if he had any feelings about waiving extradition. When Lionberg responded that he felt he should talk to an attorney about the matter, Hover ended the conversation and exited from the cell. Hover contacted Detective Campion and explained that when he read Lionberg his rights, he invoked his right to counsel, and consequently, Hover told Campion, he would not pursue questioning defendant. Hover also contacted the Office of the Public Defender for Salina County and informed them that Lionberg was in custody and had requested to speak with counsel.

Lionberg was placed in a Salina County jail and had no contact with any investigating police officers during Saturday or Sunday.

During this time the Kansas police were investigating a murder that had occurred in Wabaunsee County on the Friday night prior to Lionberg's arrest. They had a description of a car connected to the homicide which fit Burroughs' Grand Prix. Further, it was known that a twelve-gauge shotgun had been used in the murder, and a shotgun was discovered in the car operated by defendant.

On Monday, March 5, 1984, Hollis Worthen was the corrections officer on duty at the Salina County jail. He testified that his duties required that he visit each cell at intervals of thirty minutes and attend to the basic needs of prisoners and verify their well-being. According to Worthen, at approximately 1:30 p.m. he visited Lionberg and asked, "How ya doing, Brian?" to which Lionberg responded, "I'm all right." Lionberg then asked Worthen "When are they going to extradite me to Rhode Island?"

Worthen replied that an extradition proceeding "takes time; that he probably would not be going before a judge until the next day, and I also told him, I said at this time I am not even sure if they will extradite you because I don't know what you're wanted for in Rhode Island."

Worthen testified that Lionberg then stated, "[T]hey want me because I killed that old lady and stole her car. That's murder one and grand theft auto." Lionberg then stated "Boy, I fucked up." Worthen described Lionberg's demeanor at this time as remorseful and stated defendant was sitting on his bunk with tears in his eyes. Worthen testified that he left the cell and reported the statements to the investigating officers, Agents Donald Winsor and Lanny Grosland of the Kansas Bureau of Investigation.

During the afternoon of March 5, 1984, Agents Winsor and Grosland went to Lionberg's cell, identified themselves, and told him that they were investigating a murder that had taken place in Wabaunsee County and wanted to ask him questions. Lionberg when admonished of his *Miranda* rights, said he understood them. Grosland testified that he then placed a waiver form on the shelf of the cell door and pointed to each part as he read it aloud so Lionberg could read the waiver form. Grosland then read from the bottom of the Kansas form, which provides:

"I understand what my rights are. I do not want a lawyer at this time. I understand and know what I am doing. No promises, threats have been made to me and no coercion of any kind has been made against me."

Lionberg signed the form. He then denied having any knowledge of what had occurred in Wabaunsee County. Lionberg stated that he had purchased the shotgun in Rhode Island for his personal protection and that he had discharged the gun four times in Rhode Island. The agents asked Lionberg why he had left Rhode Island. According to the agents, Lionberg stated that he had been westbound on Interstate 70, when, about five minutes before Trooper Hover pursued him, he switched and began traveling eastward. The agents inquired about defendant's changing his direction and, according to testimony, Lionberg stated: "I just realized what I did in

Rhode Island and I wanted to go home and turn myself in, couldn't handle it anymore."

The agents then asked what charges Lionberg was wanted for, and he responded, according to testimony at trial, that it was first-degree murder and grand theft. The agents continued asking questions about the Kansas murder, and Lionberg requested an attorney. The agents terminated questioning defendant and left the cell.

On Tuesday, March 6, 1984, Detectives John Botelho and Larry Campion arrived in Kansas from East Greenwich, Rhode Island. They identified themselves and told Lionberg they were investigating a homicide that had occurred in East Greenwich. Detective Botelho testified that Lionberg was read his rights and agreed to talk. Lionberg stated that he had planned to steal Burroughs' car about one week before the murder. He stated that he had used a large buck knife to stab Mary Burroughs and then took the keys and returned to his apartment to get food. Asked where he was going when stopped by the police in Kansas, according to Botelho, Lionberg stated: "I was going back to Rhode Island because I wanted to face any penalty that might face me."

Detective Campion wrote down each question and response, and when Botelho asked about the Kansas murder, Lionberg requested an attorney. Campion gave the four page statement to Lionberg, who read it over for corrections and said, "It's all right as it is," and signed it in the presence of a notary. Lionberg was informed that he would be charged with the homicide of Mary Burroughs and with larceny of her vehicle and burglary.

■ Regarding defendant's contention that Hollis Worthen, the corrections officer, engaged him in conversation that amounted to "interrogation," we disagree.

The United States Supreme Court has held that an accused having expressed a desire to deal with the police only through counsel, is not subject to further interrogation by authorities until counsel has been made available, unless the accused initiates further communication, exchanges, or conversation with the police. *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378, 386 (1981). It is clear from the record that after Lionberg was taken into custody, he invoked his right to counsel. Trooper Hover scrupulously honored defendant's right and closed questioning. Thereafter, defendant was placed in a cell at the Salina County jail. The trial justice was satisfied that Worthen was performing in accordance with the duties required as the corrections officer and held that the visit to defendant's cell was not to interrogate defendant further. We agree.

The conversation between Worthen and defendant began with the question "When are they going to extradite me to Rhode Island?" Worthen responded to defendant that he was unsure about the extradition process and then stated innocuously: "I am not even sure if they will extradite you because I don't know what you're wanted for in Rhode Island." According to Worthen, defendant replied, "[T]hey want me because I killed that old lady and stole her car. That's murder one and grand theft auto." The defendant added, "Boy, I fucked up," put his hands on his head and had tears in his eyes, Worthen said.

We have held that a criminal suspect may, during custodial interrogation, terminate the questioning by requesting an attorney, but the request does not preclude the suspect from subsequently waiving his right to counsel. *State v. Halstead*, 414 A.2d 1138, 1150 (R.I. 1980). *See Edwards*, 451 U.S. at 486 n. 9, 101 S.Ct. at 1885–86, n. 9, 68 L.Ed.2d at 387 n.9. "A waiver may be inferred if a suspect acts in a manner that is inconsistent with the exercise of his rights, such as by volunteering information to the authorities without the benefit of counsel when he is aware that he need not do so." *Halstead*, 414 A.2d at 1150. Moreover, the Court in *Edwards* emphasized that "we do not hold or imply that [defendant] was powerless to countermand his election or that the authorities could in no event use any incriminating statements made by [defendant] prior to his having

access to counsel." 451 U.S. at 485, 101 S.Ct. at 1885, 68 L.Ed.2d at 387. At the time Lionberg made the incriminating statements to Worthen, he had been advised of his rights two different times and invoked right to counsel. Lionberg elected to engage Worthen in discussion without counsel present and confessed to murder and grand theft.

Similarly, in *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), the defendant, having been advised of his *Miranda* rights, asked a police officer, "Well, what is going to happen to me now?" after police questioned his involvement in the death of a minor. The Court agreed that the admissibility of a confession given by a defendant who earlier invoked his *Miranda* right to counsel is to be determined by a two-step process. First, it must be asked whether the defendant "initiated" conversation; and if the answer is yes, it then must be inquired whether defendant waived his right to counsel and to remain silent, "that is, whether the purported waiver was knowing and intelligent * * * under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." *Id.* at 1046, 103 S.Ct. at 2835, 77 L.Ed.2d at 413 (quoting *Edwards v. Arizona*, 451 U.S. at 486 n. 9, 101 S.Ct. at 1885 n. 9, 68 L.Ed.2d at 387 n.9, (1981)). In determining what constitutes "initiation," the four-justice plurality concluded that "inquiries or statements * * * relating to routine incidents of the custodial relationship" would not suffice but "[questions] which evinced a willingness and a desire for a generalized discussion about the investigation" would. 462 U.S. at 1045–46, 103 S.Ct. at 2835, 77 L.Ed. 2d at 412. The four dissenters defined "initiation" more narrowly as "communication or dialogue about the subject matter of the criminal investigation." 462 U.S. at 1053, 103 S.Ct. at 2839, 77 L.Ed.2d at 418. It is clear that in the case at bar the statements made by Lionberg to Worthen manifested a willingness to discuss extradition and, more particularly, the murder in Rhode Island, thus satisfying the criteria of both the plurality and the dissenters in

*Bradshaw.* Lionberg initiated the discussion that ultimately yielded his incriminating statements.

Applying the second part of the two-step analysis in determining whether the waiver was knowingly and intelligently made by Lionberg, the trial justice considered various factors under the totality of circumstances. The defendant was fed, given the opportunity to shower, and admonished of his *Miranda* rights on two separate occasions prior to his discussion with Worthen. The trial justice properly determined that Lionberg's remarks to Worthen were gratuitous. They did not result from an interrogation, and his rights were intelligently waived.

In addition, defendant contends that the trial justice erred in finding that defendant knowingly, intelligently, and voluntarily waived his constitutional rights under the totality of circumstances in making statements to both the Kansas and the East Greenwich police. In *State v. Ferola*, 518 A.2d 1339, 1345 (R.I. 1986), we held:

"[w]hen a defendant challenges the voluntariness of a statement or confession, the trial justice must conduct a preliminary hearing outside the presence of the jury. The confession is admissible if an examination of the totality of the circumstances surrounding the interrogation shows, by clear and convincing evidence, that the defendant voluntarily waived his right to remain silent and have the assistance of counsel. *State v. Verlaque*, 465 A.2d 207, 209–10 (R.I. 1983). If the trial justice finds the confession admissible, he must then instruct the jury to make an independent assessment of its voluntariness. *Id.* at 210. On review this court looks at the record to determine whether the trial justice correctly followed these procedural safeguards. If he did, we then examine the record and order reversal only if we conclude that the decision of the trial justice was clearly wrong. *Id.* Here the trial justice correctly observed the procedural safeguards; therefore, we shall independently examine the record only to determine if his decision was clearly wrong."

According to the record, Lionberg's first incriminating statement was made to Worthen after two days in custody. No police officers interrogated him, and there was no evidence of coercive or abusive conduct. The defendant made a voluntary confession of his own volition.

Although defendant cried after telling Worthen that he had killed decedent, it seems that the tears were not conclusive of confusion, overbearance, or exhaustion, rather they may have indicated "remorse, embarrassment and possibly revulsion at the viciousness of the murder." *State v. Ferola*, 518 A.2d at 1346; (quoting *State v. Verlaque*, 465 A.2d at 210).

The Kansas and East Greenwich police acted properly in admonishing Lionberg of his rights and in procuring signed waivers. Lionberg was allowed to read and correct a four-page statement, and he signed it in the presence of a notary. The trial justice found with regard to each of the occasions on which Lionberg had made a confession, that the state had met its obligation to prove by clear and convincing evidence (1) that Lionberg had been informed of his constitutional rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); (2) that Lionberg understood these rights and had knowingly, intelligently, and voluntarily waived them; and (3) that he thereafter made oral statements and signed statements without threats or promises, reward or coercion of any type. The justice found that Lionberg had been properly treated, that he had been fed and given the opportunity to take a shower.

The record clearly indicates that the trial justice properly performed his duty in ruling on defendant's motion to suppress the confessions. His finding that the waiver and confessions were voluntary was not clearly erroneous and shall be sustained by this court.

## II

■ The next issue raised concerns the trial justice's denial of defendant's motion to suppress incriminating statements on grounds that his statements were induced by an unreasonable delay in presenting him for arraignment. In determining whether the provisions of Rule 5(a) of the Superior Court Rules of Criminal Procedure have been violated, we have held that delay, if it is to render a confession inadmissible, must have been operative in inducing the confession. *State v. Johnson*, 119 R.I. 749, 756, 383 A.2d 1012, 1017 (1978). The trial justice must consider whether the time preceding a suspect's statement had any "causative effect upon his * * * decision to confess." *State v. Ferola*, 518 A.2d at 1345 (quoting *State v. Johnson*, 119 R.I. at 757, 383 A.2d at 1017).

The record recites that the trial justice carefully considered the length of delay and determined that defendant's confession was not prompted by any unreasonable delay or coercive conduct. Lionberg was, according to the judge's findings, fed and allowed to shower, and each admission during custody was made voluntarily, without threats or coercion. Although defendant cried at the time of his statements to Worthen and cried again to the Rhode Island detectives, this was indicative of remorse or embarrassment, not overbearance of defendant's will. We find no convincing evidence that the length of time from defendant's arrest to the time of arraignment amounted to such an unnecessary delay as to be operative in inducing Lionberg's confessions.

## III

■ The next issue raised by defendant concerns the judge's denial of defendant's pretrial motion to dismiss the indictment on grounds that the state had violated article III (a) of the Interstate Agreement on Detainers Act (IAD) G.L. 1956 (1981 Reenactment) § 13–13–2.

The germane portion of § 13–13–2 art. III states, *inter alia:*

"(a) Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party state, and whenever during the continuance of the term of imprisonment there is pending in any other party state any untried indictment, information, or com-

plaint on the basis of which a detainer has been lodged against the prisoner, he shall be brought to trial within one hundred eighty (180) days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information or complaint; provided, that, for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance."

In construing this provision of the IAD, this court has stated that the 180–day period begins to run when the Office of the Attorney General receives both the prisoner's request for disposition and the Certificate of Inmate Status from the transferring prison. *State v. Moosey*, 504 A.2d 1001, 1003 (R.I. 1986).

It is largely undisputed that defendant executed the forms required on August 9, 1984, and the assistant attorney general sent an executed form entitled "Prosecutor's Acceptance of Temporary Custody" and acknowledged the receipt of the forms in a letter dated August 27, 1984. A factual dispute arose over the proper date on which the 180–day time period was to expire. At the hearing on the motion to dismiss filed by defendant, it was ruled that Lionberg's attorney effectively waived Lionberg's right to dismiss under the 180–day rule. The judge recalled that the defense attorney stated in a conference in chambers that he would not move to dismiss under the 180–day rule, but instead would negotiate a plea bargain to allow Lionberg to serve his sentence in Rhode Island rather than in Kansas. The record clearly recites the travel of the case to support the judge's determination that Lionberg had effectively waived his right to move to dismiss under the 180–day rule.

The purpose of the IAD is to assure incarcerated defendants speedy trials and to protect them from delays in trial caused by prosecuting authorities. In a case in which the state is prepared and willing to go forward while the defendant is responsible for delays, dismissal under the act is neither mandated nor warranted. *Moosey*, 504 A.2d at 1003–04. It is our opinion that the judge effectuated the intent of the act in his ruling on this issue.

■ In addition defendant raises the issue that the judge should have recused' himself from considering the motion to dismiss because he had personal knowledge of material facts which were the subject of dispute. The defendant argues that the judge could not impartially decide the motion to dismiss because he had personal knowledge of the factual dispute regarding the conference in chambers when defense counsel waived the right to dismiss under the IAD. We do not agree.

The judge's determination to deny the motion to dismiss was not a result of personal bias or prejudice. The judge cited defendant's reported postponements that delayed the trial. Our examination of the record supports the justice's finding. Pretrial conferences for November 13, 1984 and December 13, 1984, were postponed at the request of defense counsel. The case was scheduled for trial on November 29, 1984, and January 24, 1985, but was postponed at the request of defense counsel because of other pending court actions. The case was again scheduled for trial on February 7, 1985, but postponed at the mutual request of the state and defense counsel. Had defendant not caused any delay, the trial would have commenced within the time period established by the IAD.

IV

■ The defendant next asserts that the trial justice erred in overruling defendant's objection to the medical examiner's testimony. The medical examiner, according to the record, testified regarding how consistent the knife possessed by defendant was with decedent's stab wounds. The defendant does not dispute the substance of the testimony but asserts a violation by its admission into evidence on the ground that the medical examiner examined the knife

without defendant's being apprised of an examination through discovery. Further, defendant contends, that the state failed to inform him, pursuant to Super R Crim P 16, that the medical examiner would testify at trial. It is our opinion that the trial justice was correct in overruling defendant's objection.

Rule 16 provides in part that the state shall provide to a defendant upon written request:

"(7) as to those persons whom the State expects to call as witnesses at the trial, all relevant recorded testimony before a grand jury of such persons and all written or recorded verbatim statements, signed or unsigned, of such persons and, if no such testimony or statement of a witness is in the possession of the State, a summary of the testimony such person is expected to give at the trial."

We have held that the primary purpose of discovery is to eliminate surprise at trial, reasoning that when the defense is misled into proceeding to trial unprepared, the basic precepts of due process are violated. *State v. Concannon*, 457 A.2d 1350, 1353 (R.I. 1983).

The defendant relies on *State v. Adams*, 481 A.2d 718, 723 (R.I. 1984), in which we granted a new trial because the state deliberately failed to disclose a medical report to the defendant. In the case at bar, the record recites that the state informed defendant that members of the medical examiner's office were potential witnesses at trial. The state also provided defendant with an autopsy report and a report prepared by the East Greenwich police describing the knife used to murder decedent. In addition, the state disclosed that the Kansas police had recovered a large folding buck knife from defendant's vehicle. The state did not withhold from defendant or deliberately fail to provide to defendant any information. Nothing in the record indicates that the state's failure to provide a summary of Dr. Burns' expected testimony was deliberate. Without evidence to the contrary, this court will assume that nondisclosure is inadvertent rather than deliberate. *State v. Concannon*, 457 A.2d at

1353. In situations in which noncompliance with Rule 16 is inadvertent, this court will consider whether defendant was procedurally prejudiced by such noncompliance. Procedural prejudice occurs when a defendant must proceed to trial unprepared. *Id.* at 1354. The record does not demonstrate that defendant was unprepared for the trial as a result of the failure to provide a summary of the testimony by the medical examiner. We hold that the trial justice was correct in overruling defendant's objection.

## V

██ The defendant next assigns as reversible error the decision of the trial justice to permit introduction of certain photographs of decedent into evidence at trial. We are mindful that we must review the record to ascertain if the trial justice carefully considered whether the probative value of the evidence was outweighed by undue prejudice, keeping in mind that even if the evidence offered is of a gruesome nature and might tend to influence the jury unduly, it may nevertheless be admissible if it is otherwise material and competent. *State v. Ware*, 524 A.2d 1110 (R.I. 1987). The record before us is clear in supporting the ruling. The trial justice stated:

"Obviously, they are prejudicial to the defendant, but I think the probative value greatly outweighs the prejudice, and I think it is incumbent upon the state to prove premeditation. I think this is an essential element of the case, even though you have stipulated to the identity of the person and also the Medical Examiner's report. They have a right to try the case as they see fit."

The trial justice's ruling that the photographs were relevant to prove or disprove guilt of the murder charge against the defendant was correct and will not be disturbed.

For the reasons stated, Lionberg's appeal is denied and dismissed. The judgment of conviction is affirmed.