**Supreme Court**

No. 2013-189-C.A.

(P1/10-3732A)

State                           :

v.                              :

Armando Garcia.                 :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                          :

    v.                         :

Armando Garcia.                :


Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Goldberg, for the Court.**  This case stems from the gruesome murder of a young mother in her home in Pawtucket, Rhode Island.  After a jury trial, the defendant, Armando Garcia, was convicted of one count of first-degree murder, one count of failure to report a death, and one count of operating a motor vehicle without the consent of the owner.  The trial justice sentenced the defendant to life imprisonment on the murder count and imposed a five-year sentence for each of the remaining counts, to be served concurrently with each other and consecutively with the life sentence.[1]  On appeal, the defendant assigns error to the denial of his motion to suppress the confession he made to the police, certain evidentiary rulings made at trial, and the denial of his motion for a new trial.  For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

---

[1] The defendant also was adjudged to be a habitual criminal and sentenced to an additional twenty-five years to be served consecutively, pursuant to the habitual offender statute, G.L. 1956 § 12-19-21.

- 1 -

**Facts and Travel**

Brooke[2] and defendant were friends in junior high school, and, by high school their relationship developed into what defendant later characterized as "friends with benefits"—presumably of the romantic kind. As they reached adulthood, the two went their separate ways. Brooke married Joe in 2002, and, in 2007, their daughter, Ella, was born. Brooke became a stay-at-home mom and sold Avon products in her spare time. As Brooke was building her life with Joe, defendant was in and out of jail, serving time at the Adult Correctional Institutions (ACI) for multiple convictions, including possession of a stolen motor vehicle, breaking and entering, and drug possession.

In late 2009, shortly after being released from his most recent stint at the ACI, defendant visited the home of Brooke's mother and stepfather, Michelle and Roy, and arranged for Brooke to contact him in order to renew their acquaintance. She did so, and the old friends soon began to spend a substantial amount of time together. The defendant's re-entry into Brooke's life coincided with the deterioration of her previously happy seven-year marriage. Her relationship with Joe became fraught with tension as he began to suspect an affair. By mid-May 2010, Brooke told Joe that she no longer loved him. He moved out in mid-June. Meanwhile, Brooke and defendant discussed moving in together. She spent time with his family, and he introduced her to his relatives as his girlfriend.

Interactions between Brooke and Joe remained hostile even after Joe moved out of the house. In particular, on Monday, June 21, when Joe arrived at the house to pick up two-year-old Ella, he argued with Brooke about the nature of her relationship with defendant; Brooke

---

[2] In order to protect the privacy of the victim's surviving relatives, we refer to the victim and the adult members of her immediate family by only their first names; we intend no disrespect. The victim's minor daughter has been given a pseudonym.

continued to insist that they were only friends, even after Joe had discovered photographs suggesting otherwise. According to Joe, during the argument, Brooke "struck [him] multiple times." In order to subdue her during these outbursts, Joe claims to have "grabbed her * * * [and] moved her to the side onto a chair." Later that day, Brooke told Michelle that she and Joe "got into a scuffle and he pushed her down the stairs." She showed Michelle "a red mark on her * * * right side." At trial, Joe denied pushing her down the stairs.

Despite their quarrel earlier in the week, Brooke and Joe were cordial to each other when they met on Wednesday, June 23, and even decided to attend a wedding together—as friends—that Saturday night. The next night, Thursday, June 24, Brooke and Joe had sex, and he spent the night at the house. According to Joe, who continued to love his wife, "It felt like we were married again." Also that night, Brooke told her mother and a friend that "she was done with" defendant because she had learned that he was selling cocaine and she wanted to protect Ella.

Brooke's plans to break up with defendant were short-lived, however. On Friday night, June 25, Brooke told her mother that she had decided to "giv[e] [defendant] another chance" and that she and Ella were going to spend the evening with him. However, when Brooke arrived at defendant's home as planned, there was a note on the door informing her that defendant was out with his cousin. This was not the case. A furious Brooke called her mother and declared, "I can't believe that [f---ing] [racial epithet] stood me up." Brooke told Michelle that she intended to leave him a letter. In fact, defendant was in his home and could hear her in the driveway cursing him and using a racial slur.

An hour later, Brooke told her mother that she was waiting for defendant to come to her house. When Michelle told her daughter that she had been watching a true-crime show on television, Brooke mentioned that defendant had told her to tell her mother that, "if you ever find

- 3 -

me dead, Joe thinks about ways to kill me and get away with it." That was the last time Michelle spoke with her daughter.

The next morning, Saturday, June 26, Michelle, who was scheduled to babysit Ella that afternoon, attempted to call Brooke multiple times, but there was no answer. By mid-afternoon, an alarmed Michelle drove to Brooke's home and noted that Brooke's Cadillac Escalade was not in the driveway. She observed a window screen, which usually covered the window over the air conditioner, lying against the side of the house. Entering the house through the kitchen, she discovered the home in disarray. All of the cabinets were open, and items "were thrown or tossed around the room." Michelle saw a note on the counter that was addressed to defendant: "You [t]old me [y]ou would be right back[.] It [d]on't [t]ake over an [h]our [t]o [g]o 2 [b]locks[.] This night is almost exactly [l]ike Monday[.] I'll [t]alk [t]o you [l]ater[.]" A knife also lay on the counter.

In the dining room, Michelle found a butter knife lying on the floor near "a big pool of blood," as well as blood in other areas in the room. Intending to call 9-1-1, Michelle reached for the landline telephone, but it was missing. Brooke's two mobile telephones also were not in the house.[3] Michelle heard Ella call out to her from Brooke's bedroom.

Michelle found Ella, in a soiled diaper, sitting on the bed next to her mother's lifeless body.[4] Brooke was partially naked under a blanket. Her pants were tied in a knot near her ankles. There was a bottle of K-Y Jelly on the bed near Brooke's head and a bloody tampon on the floor. On the bureau sat a condom wrapper covered with dried blood, but no condom. In a frantic call to 9-1-1 from her mobile telephone, Michelle told the operator that she had found her

---

[3] Apparently, Brooke had a second mobile telephone to facilitate her affair with defendant.

[4] At trial, Michelle testified that Ella was able to climb out of her crib and into her mother's bed.

daughter dead, and, based on what Brooke had told her the previous evening, that she believed Joe had murdered his wife. Michelle repeated the allegation when the police arrived.

Meanwhile, Joe had been trying to contact Brooke without success about their plans to attend their friend's wedding that evening. Joe received a text message from a coworker informing him that emergency vehicles were parked by the house, and, still unable to reach Brooke, he drove to the home. When he arrived, Michelle identified Joe to the police, and he immediately was arrested. At the police station, detectives interrogated him until late into the night. Fervidly protesting his innocence, Joe consented to searches of his car and apartment. Neither search yielded anything. By the next day, having corroborated Joe's statements to the police concerning his recent whereabouts, Joe was released.[5]

While Joe was in custody, the police received an anonymous tip that led them to Brooke's missing car. The tip came from Blanca Mateo-Merced (Mateo-Merced), defendant's sixteen-year-old cousin. Early Saturday morning, defendant had visited the home Mateo-Merced shared with their grandmother and told them that "[t]hey killed my baby." He explained that he had arrived at Brooke's home and "found her lying in a pool of blood." Also that morning, defendant asked a family friend who runs a car-cleaning service to clean the Cadillac Escalade he was driving. The defendant explained that he had been in a fight after "[getting] caught up in the wrong place at the wrong time." The friend observed blood in the interior of the car, which he thought was defendant's because defendant had blood on his ear and his clothing. After the vehicle was cleaned, the friend parked it on Dodge Street in Pawtucket, at defendant's request.

---

[5] At trial, the state presented as witnesses two of Joe's neighbors, who also worked with Joe, who testified that they saw Joe's car parked in his assigned parking space late Friday night and early Saturday morning. They further testified that they saw him on Saturday morning at work and did not observe anything unusual. Joe testified that he was alone in his apartment during the hours Brooke likely was killed.

Forensic testing subsequently revealed that residual blood in the car was consistent with DNA from Brooke, not defendant.

Meanwhile, defendant told more relatives and another family friend that Brooke had been killed; he explained that Brooke died from a gunshot wound and that the bullet entered the house through a window. The family pleaded with defendant to report Brooke's death to the police, but to no avail; he refused to come forward because he was on probation and feared being falsely accused of the murder. He revealed to Mateo-Merced that he was contemplating going to Pennsylvania, and he asked his father for money. Later in the day, Mateo-Merced and other relatives discovered the Cadillac Escalade parked on Dodge Street, and, when confronted, defendant admitted that the car belonged to Brooke. While Mateo-Merced spoke with defendant, she noticed a small bloodstain on his shorts.[6] When she watched the 10 p.m. news that evening, Mateo-Merced learned that the police were looking for Brooke's car. She called the police from a pay phone and, without giving her name, told them where to find the vehicle.

When the police discovered Brooke's relationship with defendant, they visited his last known address. The defendant was not home, but his father answered the door and informed the officers that defendant had admitted to him that he found Brooke dead in her home.

In the early morning hours of Sunday, June 27, defendant was arrested at his grandmother's home. While being handcuffed, defendant asked, "Is this about Brooke?" When a detective responded affirmatively, defendant volunteered, "I loved her. I would never do anything to hurt that girl." At the station, police observed a cut on defendant's hand, a scratch on his thigh, and a wound on his ear.

---

[6] At trial, a DNA expert testified that the blood on defendant's shorts was "an exact match to Brooke."

At approximately 3:25 a.m., at the Pawtucket police station, Dets. Donti Rosciti (Det. Rosciti) and David Silva (Det. Silva) commenced a nine-hour interview with defendant, in which defendant waived his <u>Miranda</u>[7] rights. The defendant initially denied any involvement in Brooke's murder. He stated that he and Brooke had sex at her house on Friday evening and that he then borrowed her car and left for the night. After defendant documented this story in a formal handwritten statement, the detectives advised him that his father had disclosed that defendant had discovered Brooke's body. The defendant then proceeded to expand upon his statement; he claimed to have returned to Brooke's home after leaving the first time, found her dead in her bedroom, and fled out of fear that he would be implicated. He memorialized this new version of his story in a second handwritten statement.

During the interview, defendant learned that, because he was on probation for another offense, he would be presented in the District Court as a probation violator. The defendant stated, without prompting, that he preferred to delay transfer to the ACI and stay at the police station overnight. The defendant signed a document—prepared by the detectives—in which he "agree[d] to remain in the custody of the Pawtucket Police Department" and "waiv[ed] any right to appear in the District Court [that] morning."

The following morning, Monday, June 28, before bringing defendant to the District Court, Dets. Rosciti and Silva resumed their questioning in a videotaped second interview.[8] The detectives asked defendant to review his statements from the day before and to write another statement "in case [he] wanted to add" more details. The defendant complied. However, while

---

[7] <u>Miranda v. Arizona</u>, 384 U.S. 436, 444-45 (1966).

[8] The first interview was not videotaped. As we held in <u>State v. Barros</u>, 24 A.3d 1158, 1164 (R.I. 2011), a criminal suspect does not possess a state or federal due process right to an electronically recorded custodial interrogation. However, the subsequent interview was so recorded.

writing the third statement, defendant paused and asked for assurances that his involvement in the murder would not be reported to the media. He alluded to an off-camera discussion from the day before. When the detectives responded that they only wanted to know the truth, defendant "abruptly" put down his pen, pushed the third statement away, and asked for a cigarette. He added, "Seriously and * * * I'm gonna [sic] give you what you want." Detective Silva was "surprise[d]" and asked, "For real[,] though[,] you're not [messing with us]?" The defendant replied, "Yo[,] you guys, I'm sorry for everything[,] man," and began to cry.

The defendant then disclosed that, when he returned to Brooke's house for the second time that night, she confronted him about his sexual relationship with another woman. He stated that Brooke had hit him repeatedly, tried to choke him, and spit on him and that he responded by punching her, choking her, and stabbing her with a butter knife.[9] He demonstrated for the detectives how he swung at both sides of Brooke's head with his fists. The defendant explained that he had been drunk and had not intended to kill Brooke. When he realized Brooke was dead, he carried her to her bed and fled, but he later returned to stage a break-in. He attempted to remove the air conditioner from the window, tied Brooke up, tossed a condom wrapper nearby, and "threw * * * out" the soiled tampon Brooke had been wearing before they had sex. In addition to orally confessing to the crime, defendant recorded his confession in a fourth handwritten statement. The video shows that, when the detectives left the interview room for a moment, defendant sighed and whispered, "I'm sorry, Brooke."

A jury trial was held in Providence County Superior Court in September and October 2012. The defendant professed his innocence at trial and proffered yet another version of the

---

[9] At trial, the state's medical examiner testified that, even though he observed multiple stab wounds on Brooke's body, neither the butter knife nor the knife found on the kitchen counter were the instrumentalities that caused Brooke's sharp-force injuries.

events leading up to this murder. His defense strategy was to point the finger at Joe. Testifying on his own behalf, defendant stated that he and Brooke were not dating seriously and that she merely was one of many women with whom he was involved at the time of her death. He testified that he "wasn't really feeling it" anymore and had been "ducking and dodging" Brooke recently, including the night of her death when he initially lied about his whereabouts to avoid spending time with her.

The defendant testified that he changed his mind later that evening and visited Brooke at her house. He stated that, after they had sex, he lied that he had "something important to do" and borrowed Brooke's car. He drove around and "smoke[d] and chill[ed]," then returned to Brooke's house and smoked a blunt in the driveway before going inside. He discovered Brooke dead on the floor and "ran right to her [and] * * * started crying[,] * * * hugging, [and] kissing her." He testified that, at the time, he believed her injuries to be bullet wounds. When defendant found Ella safe in her crib, he concluded that Joe had killed Brooke. The defendant carried Brooke to her bed and set out to look for Joe. He testified that he took both of Brooke's mobile telephones because he thought they might help him find Joe. However, after defendant left the house, he abandoned his efforts to find Joe because he did not wish to insert himself into a murder investigation. He testified that, "after that, [he] got in the vehicle, [he] went toward [his grandmother's neighborhood] and threw the phone somewhere on [his grandmother's street]." The defendant explained that he felt responsible for Brooke's death because he had left her at her house to drive around and smoke a blunt. This feeling of remorse purportedly led defendant to provide the police with a "false confession."

On October 11, 2012, the jury returned a guilty verdict on all three counts charged. On appeal, defendant alleges error in the denial of his motion to suppress the confession, certain evidentiary rulings made by the trial justice, and the denial of his motion for a new trial.

## Motion to Suppress

Prior to trial, defendant moved to suppress the statements he made to the police at the time of his arrest and during the two subsequent custodial interrogations at the Pawtucket police station. After a two-day evidentiary hearing, the trial justice denied the motions. On appeal, defendant argues that the trial justice erred by not suppressing his confession.[10]

We begin by addressing defendant's assertion that the trial justice should have suppressed his confession because the state failed to prove that it was the product of a voluntary, knowing, and intelligent waiver of his constitutional rights. The defendant places particular emphasis on assurances by the detectives that they would not report his involvement to the media, his claim that he was deprived of food while in police custody, and his assertion that he was provided cigarettes despite the police station's official no-smoking policy.

This Court's review of the denial of a motion to suppress a confession that a defendant claims was involuntary is governed by a two-prong analysis. State v. Humphrey, 715 A.2d 1265, 1273 (R.I. 1998). We first examine, with great deference, "the trial justice's findings regarding the historical facts relevant to the voluntariness of the challenged confession." Id. If we accept the findings, we then proceed to the second prong of our analysis, in which "we apply those historical facts and review the trial justice's determination as to the voluntariness of the challenged confession de novo." Id. A statement is voluntary if "it is 'the product of [the

---

[10] This Court has not been asked to review the propriety of the admission of the other statements defendant made to the police.

defendant's] free and rational choice'" and not "extracted from the defendant by coercion or improper inducement, including threats, violence, or any undue influence that overcomes the free will of the defendant." Id. at 1274 (quoting State v. Amado, 424 A.2d 1057, 1062 (R.I. 1981)). In making such a determination, we assess "the totality of the circumstances surrounding the challenged statement." Id.

In the case at bar, the state presented evidence that defendant—who was no stranger to the criminal-justice system—was alert, understood the questions being asked, and showed no signs of discomfort or unjustifiable stress during his interview on Monday, June 28, 2010. He was advised of his Miranda rights both orally and in writing on multiple occasions throughout his detention at the police station, and there was ample evidence that demonstrated that defendant understood those rights and waived them of his own volition. The defendant wrote the confession in his own handwriting and used his own words to describe his acts. The video recording demonstrates that, when Det. Silva assured defendant that he was taking "a step in the right direction" by confessing, defendant responded, "I don't know if you guys are normally cool, and I don't know if you [are] just tryin[g] to get [s--t] off me * * * but[,] * * * don't take this wrong[,] * * * I ain't do[ing] it [be]cause you guys are bein[g] cool or [be]cause you manipulated me."

In a bench decision, the trial justice credited the testimony of the detectives and found no evidence of coercion or threats. The trial justice rejected defendant's claim that the detectives' willingness to violate the no-smoking policy implied that they also may have violated defendant's constitutional rights. She observed that defendant received food when he requested it. Summarizing the contents of the video recording, she stated, "I don't think you could find a * * * situation under which [defendant] was questioned where it was more non[-]threatening than

- 11 -

we had here." She concluded that there was clear and convincing evidence to demonstrate that defendant voluntarily, knowingly, and intelligently waived his right to freedom from self-incrimination.

Having reviewed the record in this case, we accept the trial justice's findings of historical fact. Further, in light of defendant's admissions at trial that the police "kept it professional" and did not extract his confession through threats, force, or coercion,[11] we are hard-pressed to accept his argument that he was "emotional[ly] coerc[ed]" into falsely confessing to Brooke's murder. In fact, defendant's own testimony belies that contention. He testified that he fabricated the confession not because of police coercion, but because he blamed himself for not having been with Brooke at the time she was killed and for having "let [her] family down." After considering the totality of the circumstances surrounding the confession, we are of the opinion that the statements were the product of defendant's free will and were not the product of coercion, threats, or promises made by the police.

The defendant also contends that suppression was required because his custodial statements purportedly resulted from the state's failure to promptly present him before a judicial officer after his arrest. Rule 5(a) of the Superior Court Rules of Criminal Procedure provides, in relevant part, that "[a]ny person making an arrest without a warrant shall take the arrested person

---

[11] The defendant testified, "Them guys [Dets. Rosciti and Silva] are professionals. They treated me * * * normal, * * * nice, nothing out of the ordinary, * * * they treated me quiet, asking me questions, stuff like that." Moreover, the following exchange occurred on cross-examination:

"Q    And there was no question nobody forced you, threatened you, coerced you into giving a statement; isn't that correct?

"A    Not at all, not at all."

- 12 -

without unnecessary delay before a judge of the District Court * * *."[12] This rule is not one of constitutional dimension, but, rather, it serves as "a prophylactic measure designed to prevent other constitutional infirmities." State v. Nardolillo, 698 A.2d 195, 199 (R.I. 1997); see also State v. Brown, 898 A.2d 69, 75, 78 (R.I. 2006) (describing the similarly-worded Rule 9(a) of the District Court Rules of Criminal Procedure, which applies to misdemeanors, as "operat[ing] as [a] procedural instruction[] or guideline[] that notif[ies] the police of the steps that must be taken after they effectuate an arrest"). A confession should be suppressed on the basis of "undue" delay in presentment only if it "had any 'causative effect upon [the defendant's] * * * decision to confess.'" Nardolillo, 698 A.2d at 199 (quoting State v. Lionberg, 533 A.2d 1172, 1178 (R.I. 1987)). We are not confronted with such a case.

The right to prompt presentment is subject to waiver. United States v. McDowell, 687 F.3d 904, 910 (7th Cir. 2012); United States v. Bell, 740 A.2d 958, 963 (D.C. 1999). When the defendant waives his or her right to presentment after receiving the requisite Miranda warnings, he or she "must be treated as having waived consideration of any unreasonable delay in presentment occurring during that period * * *." Bell, 740 A.2d at 965; see id. at 959 (reversing the suppression by the trial court of the defendant's incriminating statements, made after a fifty-four-hour delay between arrest and presentment, because the defendant had waived his rights under Rule 5(a) of the District of Columbia Superior Court Rules of Criminal Procedure—which requires that "[a]n officer * * * making an arrest without a warrant * * * shall take the arrested person without unnecessary delay before the [c]ourt").

---

[12] In his appellate brief, defendant relies on Rule 5(a) of the Superior Court Rules of Criminal Procedure. The state suggests that the applicable rule is Rule 9(a) of the District Court Rules of Criminal Procedure. Because the relevant portions of the rules are substantively identical for the purposes of this case, we need not resolve this discrepancy.

In the case before us, the agreement signed and initialed by defendant on Sunday, June 27, 2010 stated, in pertinent part: "I understand that I am waiving any right to appear in the District Court this morning, and understand that I will be presented to the District Court on June 28, 2010." Detective Rosciti's testimony at the pretrial suppression hearing suggested that, had defendant not signed the document, defendant immediately would have been presented to a bail commissioner and transported to the ACI because courts are closed on Sundays.

On appeal, defendant claims that the detectives "unduly influenced him to sign that form by falsely informing him that his request to remain at the Pawtucket [p]olice [s]tation, as opposed to being transported to the ACI, could only be granted if he were to sign it." This argument ignores the fact that it was defendant who first requested that he be allowed to remain at police headquarters rather than be transported to the ACI. He merely memorialized that waiver in writing. Secondly, defendant makes this argument in spite of the clause in the agreement—which he initialed—declaring that "nothing has been promised to me in return for my decision to enter into [this agreement]." The defendant points to Det. Rosciti's testimony that defendant had "expressed interest in staying in [the] Pawtucket [police station] for the night. So, we [Dets. Rosciti and Silva] said we could make that happen if he wanted to sign an agreement." He argues that the detectives' promise to defendant was a ploy because "[t]here was nothing preventing the detectives from allowing [defendant] to stay at the police station until he could be brought to court first thing Monday morning." We reject this contention. The written waiver executed by defendant in this case reflects both a voluntary waiver of his rights under Rule 5(a) and sound police practices.

We also note that the video recording from Monday, June 28, 2010 demonstrates that defendant was in no rush to be presented in the District Court. After confessing to Brooke's

murder, and, without prompting, he twice voiced his desire to delay presentment again until Tuesday. In so doing, he specifically requested that he not be presented in court that day; he made no mention of wanting to avoid spending the night at the ACI. The spontaneity of defendant's request on Monday to further push back his court appearances and the fact that he made that request independent of an expressed wish to spend another night at the police station suggest that defendant was eager to delay his court appearances irrespective of any desire to avoid transfer to the ACI. Consequently, we cannot say that the waiver of his right to presentment on June 27, 2010 was the product of undue influence or that the final confession was the causative effect of any undue delay in presentment.

### Evidentiary Issues

The defendant also challenges two evidentiary rulings made by the trial justice. First, he assigns error to the admission of Joe's testimony regarding the dress in which Brooke was buried.[13] Although it is doubtful that the issue was adequately preserved, we conclude that the

---

[13] The following exchange occurred on direct examination regarding Brooke's dress:

"Q    You mentioned you had plans to go out with your wife on the 26th of June to a wedding; is that correct?

"A    That's correct.

"Q    And she had shown you a dress that she had purchased according to your testimony; is that correct?

"A    That's correct.

"Q    And at some point in time did you ever see that dress again?

"A    What happened was Brooke's mother, Michelle, she took the dress, and that was the dress that we buried Brooke in.

"[PROSECUTOR]:    Judge, can I have one moment, please?

- 15 -

alleged error, if any, was harmless in the wake of the substantial evidence supporting defendant's conviction.[14]  See State v. Robertson, 740 A.2d 330, 337 (R.I. 1999) ("[T]he admission of impermissible evidence need not be prejudicial in a case in which there is independent overwhelming evidence of a defendant's guilt.").  Here, the state introduced a video recording of defendant confessing to Brooke's murder, as well as his handwritten confession.  A forensic expert testified that blood on defendant's shorts and in Brooke's car, which he was driving, was consistent with Brooke's.  It was undisputed at trial that, in the first several hours after the murder, defendant was observed with multiple injuries.  There was testimony, including from defendant himself, that, despite his professed innocence, he doggedly refused to report Brooke's murder to the police and considered fleeing to Pennsylvania.  In light of such overwhelming evidence of defendant's guilt, even if we were to determine that the testimony about the dress lacked relevance and its admission constituted error, the testimony was harmless beyond a reasonable doubt and did not contribute to defendant's conviction.

In addition to challenging the testimony about the dress, defendant also assails the denial of his motion in limine to exclude a single autopsy photograph of Brooke's brain, in which the brain was exposed in order to show the specific injuries she suffered when she was beaten to death.  Although the trial justice denied the motion, she properly limited the use of the

---

"THE COURT:        Can I see counsel at the side bar?"

At sidebar, the parties discussed the admission of a different piece of evidence.  The prosecutor asked defense counsel if he objected to the admission of that evidence, and he responded, "Yeah, I do.  I just move to strike that last piece about the burial of the dress.  I don't think it's relevant." The trial justice overruled his objection.  The question had been asked and answered, without objection, and the only ground for the motion to strike the testimony was relevance.

[14] Our longstanding raise-or-waive rule precludes a party from "argu[ing] an issue on appeal that has not been articulated at trial." Battle v. State, 125 A.3d 130, 134 (R.I. 2015) (quoting State v. Ciresi, 45 A.3d 1201, 1212 (R.I. 2012)).

photograph. The state was directed to crop the photograph and to display it on a large screen only "as briefly as possible" during the medical examiner's testimony. At trial, the medical examiner explained that Brooke died from multiple injuries to her brain caused by blunt-force trauma. He testified that, during the autopsy, he observed hemorrhaging to Brooke's brain, and he used the photograph to explain that "direct impact" had caused her brain "to move and crush itself on the bone." Due to a malfunction in the projector, the photograph was not displayed on a large screen; rather, the medical examiner stood before the jury with a hard copy and explained what the image depicted. It was not published to the jury. On appeal, defendant contends that the admission of the photograph was not essential to explain the cause of Brooke's death, particularly where the state had introduced multiple autopsy photographs without objection, and that its only purpose was to inflame the passions of the jurors. We disagree.

The decision to admit or exclude photographs presented at trial rests firmly within the discretion of the trial justice. State v. Brown, 88 A.3d 1101, 1119 (R.I. 2014). Consequently, our review is limited to

> "whether the trial justice carefully considered whether the probative value of the evidence was outweighed by undue prejudice, 'keeping in mind that even if the evidence offered is of a gruesome nature and might tend to influence the jury unduly, it may nevertheless be admissible if it is otherwise material and competent.'" State v. Tassone, 749 A.2d 1112, 1119 (R.I. 2000) (quoting State v. Griffin, 567 A.2d 796, 801 (R.I. 1989)).

We have acknowledged that, although "[a]utopsy photographs * * * may be difficult for jurors to see," they are "unquestionably relevant" to the state's need "to prove each element of a crime beyond a reasonable doubt." Brown, 88 A.3d at 1120 (quoting State v. Carter, 744 A.2d 839, 847 (R.I. 2000)). The cause of death need not be in dispute for such photographs to be relevant. Id. at 1121.

In <u>Brown</u>, 88 A.3d at 1120, this Court was asked to determine whether the admission of some, but not all, autopsy photographs at trial was in error given that the victim's cause of death was not in dispute. We responded in the negative. <u>Id.</u> at 1121. The medical examiner had used the photographs—similar in nature to the photograph at issue here—as "visual aids to explain [his] testimony about the effect of the blunt-force trauma on the victim's skull and brain." <u>Id.</u> The Court observed that, "[E]ven though the cause of death was not in dispute, the state still bore the burden of proving every element of the case beyond a reasonable doubt." <u>Id.</u> Accordingly, the Court determined that the trial justice did not abuse his discretion in admitting the photographs. <u>Id.</u>

As in <u>Brown</u>, the autopsy photograph in the case at bar facilitated the jury's understanding of highly complex testimony by the medical examiner about the cause of Brooke's death. The medical examiner's explanation of the photograph also tended to demonstrate the veracity of defendant's video-recorded confession to police, in which he mimicked how he punched Brooke on both sides of her head. We note the very narrow and cautious ruling by the trial justice, in which she restricted the scope of the photograph and the amount of time the jury viewed it. We perceive no abuse of discretion.

### Motion for a New Trial

Lastly, defendant argues that the trial justice overlooked and misconceived material evidence in denying his motion for a new trial. "When ruling on a motion for a new trial, the trial justice acts as a thirteenth juror, exercising 'independent judgment on the credibility of witnesses and on the weight of the evidence.'" <u>State v. Gregson</u>, 113 A.3d 393, 398 (R.I. 2015) (quoting <u>State v. Matthews</u>, 88 A.3d 375, 387 (R.I. 2014)). The task before the trial justice is to "(1) consider the evidence in light of the jury charge, (2) independently assess the credibility of

the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." Id. (quoting Matthews, 88 A.3d at 387-88). After following these steps, the trial justice should deny the motion if he or she would have reached the same conclusion as the jury or upon a finding that "reasonable minds could differ." State v. Nickerson, 94 A.3d 1116, 1128 (R.I. 2014) (quoting State v. Buchanan, 81 A.3d 1119, 1127 (R.I. 2014)), cert. denied, 135 S. Ct. 1907 (2015) (mem.). This Court gives the trial justice's decision "great weight" if sufficient rationale was articulated for denying the motion. Id. at 1129 (quoting Buchanan, 81 A.3d at 1127). We will not disturb the decision unless the trial justice "overlooked or misconceived material evidence or otherwise was clearly wrong." Id. (quoting Buchanan, 81 A.3d at 1127).

Still clinging to his theory that it was Joe who killed Brooke, the defendant contends on appeal that the trial justice failed to consider evidence of Joe's motive to murder Brooke and the supposed "gaping hole in his alibi," and that she overlooked the defendant's lack of motive to kill Brooke. This argument is unavailing. Importantly, in reviewing the evidence adduced at trial, the trial justice found Joe to be a credible witness. She addressed but rejected the defendant's theory that Joe killed Brooke and noted that there was "not one scintilla of evidence" to support either Joe's involvement or a motive. In contrast, she concluded that there was substantial evidence of the defendant's guilt. She found him not to be credible as a trial witness; she instead concluded that his confession had been truthful and demonstrated consciousness of guilt. The trial justice declared that, "[T]he video speaks for itself." Contrary to the defendant's contention that he lacked a motive to murder Brooke, the trial justice recounted evidence that his relationship with Brooke had soured by the night of her murder. The trial justice also noted the wealth of forensic evidence linking the defendant to the crime scene, his behavior after

supposedly finding Brooke's body, the multiple variations to the defendant's story, and his videotaped impromptu apology to Brooke when left alone in the interview room at the police station. The trial justice concluded that she would have reached the same result as the jury. There is no evidence that the trial justice overlooked or misconceived material evidence in this case.

## Conclusion

Because we conclude that the defendant's arguments on appeal lack merit, the judgment of conviction is affirmed, and the case is remanded to the Superior Court.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**      State v. Amando Garcia.

**CASE NO:**      No. 2013-189-C.A.
(P1/10-3732A)

**COURT:**      Supreme Court

**DATE OPINION FILED:**  July 7, 2016

**JUSTICES:**      Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**      Associate Justice Maureen McKenna Goldberg

**SOURCE OF APPEAL:**   Providence County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Susan E. McGuirl

**ATTORNEYS ON APPEAL:**

For State:  Lauren S. Zurier
Department of Attorney General

For Defendant:  Megan F. Jackson
Office of the Public Defender